BICYCLE TRAILS COUNCIL OF MARIN, a California Nonprofit corporation; Bicycle Trails Council of the East Bay, a California nonprofit corporation; International Mountain Bicycling Association, a California nonprofit corporation; League of American Wheelmen, a Maryland nonprofit corporation, et al., Plaintiffs–Appellants,

v.

Bruce BABBITT,* Secretary of the Interior; James M. Ridenour, Director of the National Park Service; Brian O'Neill, General Superintendent of the Golden Gate National Recreation Area, Defendants–Appellees,

Bay Area Trails Preservation Council; Marin Horse Council; Tamalpais Conservation Club; Sierra Club and National Parks and Conservation Association, all nonprofit corporations, Defendants–Intervenors–Appellees.

No. 94–16920.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1996.

Decided May 6, 1996.

As Amended June 17, 1996.

---

\* Bruce Babbitt succeeded Manuel Lujan, Jr. as Secretary of the Interior.

Terry J. Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for plaintiffs-appellants.

Robert L. Klarquist, United States Department of Justice, Washington, D.C., for defendants-appellees.

Deborah S. Reames, Sierra Club Legal Defense Fund, San Francisco, California, for defendant intervenors-appellees.

Before: REINHARDT, THOMPSON, and O'SCANNLAIN, Circuit Judges.

### ORDER

We affirm the district court's grant of summary judgment in favor of defendants, authored by the Honorable Eugene F. Lynch. We adopt the district court's thorough and well-reasoned order granting summary judgment, with the exception of the waiver analy-

sis in Parts III(A)(1)(a) and III(A)(2)(a), as to which we express no opinion. The district court's order is appended hereto, as amended to reflect the omission of the waiver analysis.

AFFIRMED.

## APPENDIX

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

Bicycle Trails Council of Marin, a California nonprofit corporation, Bicycle Trails Council of the East Bay, a California nonprofit corporation, International Mountain Bicycling Association, a California nonprofit corporation, League of Wheelmen, a Maryland nonprofit corporation, Charles Cunningham, Angela Di-Meglio, Linda Enis, David Garoutte, Alan Goldman, Stephen Hoxie, James E. Jacobson, Abby Minot, Todd Oursten, and Adrienne Shapiro, as individuals,

*Plaintiffs,*

v.

Bruce Babbitt, Secretary of the Interior, James M. Ridenour, Director of the National Park Service, Brian O'Neill, General Superintendent of the Golden Gate National Recreation Area,

*Defendants;*

Bay Area Trails Preservation Council, et al.,

*Defendant–Intervenors.*

No. C–93–0009 EFL

### ORDER GRANTING DEFENDANTS SUMMARY JUDGMENT

Filed September 1, 1994

### I. INTRODUCTION

Plaintiffs challenge the National Park Service ("NPS") regulations governing the use of bicycles within areas administered by it, including the Golden Gate National Recreation Area ("GGNRA"). Specifically, plaintiffs seek review of both the regulations set forth at 36 C.F.R. section 4.30 ("the 1987 regulation"), which applies generally to NPS lands, and the Marin Trails Use Designation Plan for GGNRA adopted as the final rule at 57 Fed.Reg. 58711–16 (Dec. 11, 1992)(codified at 36 C.F.R. section 7.97) ("the 1992 trail plan").

### II. BACKGROUND

In 1964, NPS at its own initiative implemented a management by categories scheme by which units of the National Park System would be classified "natural," "historical," or "recreational," [1] and by which management policies would be formed so as to regulate these three types of units in conformity with their differing classifications. The effect of this scheme would be, *inter alia,* that recreational units would be managed in a less restrictive and less resource-protective manner than units classified natural or historical. Under this scheme, NPS in 1966 decided to alter its longstanding policy regarding bicycle use in park units from one wherein all trails were closed unless designated open to one in which the old rule generally applied except in units classified as recreational, in which trails would be presumed open to bicycle use unless designated closed by the local park superintendent.

By a series of amendments to the National Park Service Organic Act, 16 U.S.C. sections 1 et seq., Congress disapproved of this management by categories scheme and directed that all units of the national parks were to be treated consistently, with resource protection

---

1. The "recreational" management category was an internal administrative construction and was not necessarily coextensive with those units that Congress in enabling legislation had named "Re-

creation Areas." However, GGNRA was both named a "Recreation Area" in its enabling legislation, 16 U.S.C. section 460bb, and deemed a recreational unit under NPS's taxonomy.

the primary goal,[2] while retaining the flexibility for individual park units to approve particular uses consistent with their specific enabling legislation. Thus, NPS eliminated these management categories from its internal administration in 1978 and ultimately began promulgating regulations in the 1980's eliminating these categorical distinctions from the Code of Federal Regulations.[3] The elimination of the last regulatory reference to these management categories was one of the objectives articulated by NPS for the rulemaking effecting the 1987 regulation. *See* 52 Fed.Reg. 10670 (April 2, 1987).

The 1987 regulation, adopted pursuant to notice and comment, established a uniform rule for national park units wherein all bicycle use of off-road areas would be prohibited unless local park superintendents designated particular trails to be open. (As noted, this had previously been the rule in all but the recreation units.) Local park officials determined that they would not enforce this rule in the GGNRA until it was determined which trails would be open and which closed to bicycle use. Thus, because of NPS's and the GGNRA Superintendent's exercise of prosecutorial discretion, the 1987 regulation was not enforced and bicyclists in fact retained

access to all trails in the GGNRA pending the development of a trail use plan. Finally, after a long and contentious trail designation process, the 1992 trail plan was adopted (also pursuant to notice and comment) establishing which trails were to be open to bicycles and which trails were to be closed.

Plaintiffs applied to this Court for a preliminary injunction against the enforcement of the 1992 trail plan. This application was denied in February of 1993. Defendant–Intervenors' motion to intervene was granted on February 18, 1993. Plaintiffs and defendants have filed cross-motions for summary judgment, filed oppositions to one anothers' motions, and replied to these oppositions. Defendant–Intervenors have filed an opposition to plaintiffs' motion for summary judgment and a reply brief in support of defendants' motion. This motion has been submitted on the 1987 and 1992 administrative records. Having considered all of the briefs of the parties, and having also considered the oral arguments presented at the hearing of November 12, 1993, this Court stands ready to rule.

### III. DISCUSSION

As described above, plaintiffs challenge two agency actions: the adoption in 1987 of a

---

**2.** The general history of NPS's management by categories scheme and Congress's reaction to it is set forth in detail in *National Rifle Association v. Potter*, 628 F.Supp. 903 (D.D.C.1986). Rather than recounting it here in detail, this Court adopts the findings of the D.C. Circuit on this issue. *See also Michigan United Conservation Clubs v. Lujan*, 949 F.2d 202 (6th Cir.1991).

**3.** For example, in 1982 NPS proposed regulations effecting substantial changes to the general Park Service regulations and noted:

A major effect of this rulemaking is the elimination of the management categories from Parts 1 through 3 of the Code of Federal Regulations. Secretary of the Interior Udall recognized, in a letter to the Director, that the National Park System was comprised of three broad categories—natural, historical and recreational, and that certain principles for guidance in resource management, resource use and physical developments of each category should be developed. Based upon these principles, the National Park Service developed a series of Administrative Policies for each cate-

gory which served as guidelines for park management for a number of years.

One application of these guidelines was incorporation of the management categories in regulations established to control certain park uses. In general, these regulations reflected a feeling that public use could, in some instances, be less restricted in areas within the recreation category.... Since 1964, changes in the composition of the National Park System have been extensive. Each unit must now be given more individual attention in planning and management to ensure the legislative mandates and policy requirements are met. As a consequence, broad management categories are no longer effective tools to deal with many of these issues, and the National Park Service has determined that their use should be terminated.

47 Fed.Reg. 11598 (March 17, 1982).

When this change was adopted as a final rule, NPS repeated much of the above language, responded to comments regarding the elimination of these categories, and further noted that it was abolishing these categories in response to what it interpreted as a specific directive from Congress. 48 Fed.Reg. 30252, 30252–53 (June 30, 1983).

revised 36 C.F.R. section 4.30 and the development and promulgation in 1992 of a trail plan for the Marin Headlands section of GGNRA.

### A. THE 1987 REGULATION

The 1987 rule here challenged reads:

(a) The use of a bicycle is prohibited except on park roads, in parking areas and on routes designated for bicycle use; provided, however, the superintendent may close any park road or parking area to bicycle use pursuant to the criteria and procedures of §§ 1.5 and 1.7 of this chapter. Routes may only be designated for bicycle use based on a written determination that such use is consistent with the protection of the park area's natural, scenic and aesthetic values, safety considerations and management objectives and will not disturb wildlife or park resources.

(b) Except for routes designated in developed areas and special use zones, routes designated for bicycle use shall be promulgated as special regulations.

36 C.F.R. section 4.30.

The National Park Service Organic Act provides that the National Park Service shall:

promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified, ... by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. section 1.

Additionally, the Organic Act provides:

The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monu-

ments, and reservations under the jurisdiction of the National Park Service.

16 U.S.C. section 3.

### 1. The Organic Act and Review Under Chevron

■ The National Park Service Organic Act expressly delegates rulemaking authority to the Secretary of the Interior to promulgate rules and regulations to implement the Act. 16 U.S.C. section 3. Legislative regulations promulgated pursuant to such express authority will be upheld "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

Plaintiffs challenge the 1987 regulation and seek to have it vacated on the theory that it is arbitrary and not based upon a permissible interpretation of the Organic Act. Defendants and Intervenors argue that the 1987 regulation was based upon a mandated or at least clearly permissible interpretation of the Organic Act and its amendments.

### a. Waiver [omitted]

### b. Statutory Interpretation

Plaintiffs challenge the legality of the regulation on the theory that it is not based upon a permissible interpretation of the Organic Act. This challenge fails. A review of the Organic Act and the history of its amendments shows that NPS based its decision to eliminate the reference to management categories (and thus to eliminate the special "recreation" unit rule) in the 1987 regulation on a mandated and certainly permissible construction of the Organic Act and its amendments.

In response to congressional amendments to the Organic Act, NPS in 1978 began phasing out its usage of the "management categories" that had been earlier developed to allow for the different treatment of different classes of units in the National Park System. In the 1980's, NPS began eliminating such distinctions in its regulations. NPS interpreted Congress's amendments to the Organic Act to be clear in the message that NPS

was not to single out a particular class of units of the park system (i.e. recreational units) for less protective treatment, but that instead NPS was to manage all units of the park system so as to effect the purpose of the Organic Act-primarily resource protection. *See* 48 Fed.Reg. 30252 (June 30, 1983); *Michigan United Conservation Clubs v. Lujan,* 949 F.2d 202 (6th Cir.1991); *National Rifle Assn. v. Potter,* 628 F.Supp. 903 (D.D.C.1986).

The 1987 amendment to section 4.30 was part of a rulemaking whose purposes included "to eliminate the remaining references to the management categories formerly used to classify park areas." 52 Fed.Reg. 10670. Formerly, regulations promulgated in 1966 had provided that in "historic" or "natural" park units, off-road trails and areas were "closed-unless-designated-open" for bicycle use, while in "recreational" units off-road trails and areas were "open-unless-designated-closed" for bicycle use. 36 C.F.R. section 2.30 (1967 ed.), moved to 36 C.F.R. section 4.3 (July 1, 1977 ed.). The new section 4.30 results in a "closed-unless-designated-open" status for off-road areas in all park units.

Plaintiffs argue that even if NPS interpreted Congress's amendments to the Organic Act as mandating consistency throughout the park system, the NPS decision to achieve this consistency by applying the "closed-unless-designated-open" rather than "open-unless-designated-closed" standard was arbitrary and not based upon a permissible interpretation of the Organic Act.

▆ The Supreme Court has established a two-step process for reviewing an agency's construction of a statute it administers:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would

be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (1984). At "step one," if a court "employing traditional tools of statutory construction ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. At "step two," "The Court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 10, 104 S.Ct. at 2782 n. 10.

*i. Chevron Step One*

Intervenors argue persuasively that this is a *Chevron* "step one" case in that Congress clearly intended by its 1970 and 1978 amendments to the Organic Act that NPS alter its practice of governing recreational park units under less restrictive standards and instead manage all areas of the park system uniformly with the fundamental goal of resource protection in mind. In the 1970 amendments to the Organic Act, Congress recognized that "the national park system has grown to include superlative natural, historic, and recreation areas," 16 U.S.C. section 1a–1, that "the purpose of this Act [is] to include all such areas in the system and clarify the authorities applicable to the system," *id.,* and that "the various authorities relating to the administration and protection of areas under the administration of the Secretary of the Interior, through the National Park Service, ... shall ... be applicable to all areas within the national park system." 16 U.S.C. section 1c(b). Further, the definition of "national park system" was changed so as to include for the first time a reference to recreational areas: "The 'national park system' shall include any area of land and water now or hereafter administered by the Secretary of the Interior through the National Park Service for park, monument, historic, recreation-

al, or other purposes." 16 U.S.C. section 1c(a).

Intervenors also argue that the legislative history of the 1970 amendments makes clear the congressional intent that those recreational park units not be given less protective treatment than other units in the park system. For example, the House Report, H.R.Rep. No. 91–1265, 91st Cong. 2nd Sess. 1970 U.S.Code Cong. & Ad.News at 3785, accompanying the bill amending the Organic Act, Pub.L. No. 91–383, noted that because the Organic Act "contains no reference to more recent concepts like national recreation areas, national seashores, or national lakeshore," ... "the usual rules of construction ... could result in interpretations which would lead to the administration of the system so that it would be almost devoid of uniformity." However, the Organic Act (and some other statutes) "have desirable, useful, and necessary provisions and they should be applicable uniformly throughout the National Park System." Thus, the bill's "Section 1 ... emphasizes the common purpose of all units of the national park system and declares that its purpose is to include all such areas in the system and to clarify the authorities applicable to it." 1970 U.S.Code Cong. & Adm.News, Vol. 2, 91st Cong., 2d Sess., at 3785–3787.

In the 1978 amendments to the Organic Act, Congress amended the Organic Act to read: "the promotion and regulation of the various areas of the National Park System ... shall be consistent with and founded in the purpose established by Section 1[4] of this title, to the common benefit of all the people of the United States." 16 U.S.C. section 1a–1. The purpose of this change was described in the House Report as to add "a declaration by Congress" that the promulgation and regulation of the National Park System is to be consistent with the Organic Act for the National Park Service. The protection of the units of the system is to be carried out in accordance with the maintenance of the in-

tegrity of this system, and management of these areas shall not compromise these resource values except as Congress may have specifically provided. 1978 U.S.Code Cong. & Adm.News, 95th Cong., 1st sess., at 463. It was in response to the 1978 amendments that NPS immediately began the process of eliminating from its regulations and its management practices the management categories of "natural," "historic," and "recreational" units. *See* 48 Fed.Reg. 30252.

■ This Court agrees with Intervenors that the statutory language and the legislative intent of the 1970 and 1978 amendments mandated that NPS discontinue the practice of managing recreation areas under less protective rules than it was using in managing natural and historic areas. The purpose of these amendments was to bring recreational units (including recreation areas, seashores, and lakeshores) into the fold and require that they be managed consistently with the rest of the system. Congress clearly intended and mandated that NPS eliminate the distinctions and treat all units as it had been treating those parks that had been expressly within the ambit of the Organic Act, the natural and historic units, with resource protection the overarching concern. In light of this mandate, NPS had no choice when amending section 4.30 as between making all parks' trails "open-unless-designated-closed"—the prevailing practice only in recreation units—or "closed-unless-designated-open"—the prevailing practice in the natural and historic areas. NPS could only effect the intent of Congress by amending 4.30 such that all parks were to be treated uniformly in the manner that natural and historical units had previously been managed and thus that all trails were to be "closed-unless-designated-open."

NPS in amending section 4.30 (in accordance with its more general policy of eliminating management categories and deleting the less restrictive "recreation" unit rules) acted so as to "give effect to the unambiguously expressed intent of congress." *See*

---

4. 16 U.S.C. section 1 provides that the "fundamental purpose" of National Park Service Units "is to conserve the scenery and the natural and historic objects and wildlife therein and to pro-

vide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

*Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. The challenged regulation, therefore, is valid.

### ii. Chevron Step Two

■ Even if the intent of Congress were not so clear on this issue, the regulation would still be upheld as based on a permissible interpretation of the Organic Act. As noted above, legislative regulations promulgated pursuant to an express grant of statutory rulemaking authority are valid "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. If an agency decision " 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 383, 81 S.Ct. 1554, 1560–61, 1560–61, 6 L.Ed.2d 908 (1961)).

As noted above, the Organic Act provides that NPS "shall promote and regulate the use of the Federal areas known as national parks ... by such means and measures as conform to the fundamental purpose of the said parks, ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations," 16 U.S.C. section 1, and that "The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks." 16 U.S.C. section 3.

Courts have noted that the Organic Act is silent as to the specifics of park management and that "under such circumstances, the Park Service has broad discretion in determining which avenues best achieve the Organic Act's mandate.... Further, the Park Service is empowered with the authority to determine what uses of park resources are proper and what proportion of the park's resources are available for each use." *National Wildlife Federation v. National Park Service,* 669 F.Supp. 384, 390 (D.Wyo.1987), citing *Organized Fishermen of Florida v. Hodel,* 775 F.2d 1544, 1550 (11th Cir.1985)[, *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986) ]; *Sierra Club v. Andrus,* 487 F.Supp. 443, 448 (D.D.C.1980), *aff'd, Sierra Club v. Watt,* 659 F.2d 203 (D.C.Cir. 1981); *see also Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1253 (9th Cir.1979)(noting that allocation of a limited use between competing user groups "is well within the area of administrative discretion granted to the NPS")[, *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980) ].

■ A decision to limit mountain bicycle use to trails affirmatively designated as appropriate for such use fails comfortably within this broad grant of discretion to the Secretary under the Organic Act. The Organic Act is unquestionably silent on the precise issue of bicycle trail access. However, the Secretary is directed to conserve the natural elements of the parks for the future, 16 U.S.C. section 1, to "provide for the enjoyment" of the parks, to manage the parks "in light of the high public value and integrity of the National Park System," 16 U.S.C. section 1a–1, and to make such rules as "he may deem necessary or proper for the use and management of the parks." 16 U.S.C. section 3. In light of this language, an interpretation that the Organic Act allows for this closed-unless-designated-open approach for bicycle trail access cannot be termed "manifestly contrary to the statute." The legislative history and the statutory amendments discussed above further reinforce this finding. This regulation is thus based upon a permissible interpretation of the statute and is valid on this alternate ground as well.

■ Plaintiffs argue at length in their briefs and almost exclusively at oral argument that the 1987 regulation is invalid because it reflects NPS reversing its own earlier position on mountain bicycle use in recreation areas. Citing the Supreme Court in *Motor Vehicle Mfrs. Assn. v. State Farm,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983)("An agency's view of what is in the public's in-

terest may change, either with or without a change in circumstances[,] but an agency changing its course must supply a reasoned analysis."), plaintiffs argue that NPS's latest interpretation of the Organic Act as expressed in 36 C.F.R. section 4.30 is entitled to less deference because NPS earlier interpreted the Organic Act to reach an opposite conclusion regarding mountain bicycling in recreation areas under its old 36 C.F.R. section 4.3. *See, e.g., Immigration and Naturalization Service v. Cardoza-Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). Plaintiffs further argue that NPS did not provide the requisite "reasoned analysis" to justify its change in position. Plaintiffs' argument relying upon *State Farm* fails for at least three reasons.

First, unlike *State Farm* where the agency flip-flopped in its interpretation of a single unamended standard, this case involves a situation where the agency changed its position to accommodate the amendments by Congress of the underlying Act. NPS did not simply decide one day to reverse its position of the day before. Rather, following amendments to the Organic Act and pursuant to a longstanding policy by which NPS was eliminating its management categories, NPS changed 36 C.F.R. section 4.30 so as to be consistent with the newly worded statute.

Second, unlike *State Farm*, this is not a case where the agency can be said to have changed its "policy." Rather, as in *Northwest Motorcycle Assn. v. USDA*, 18 F.3d 1468, 1480 (9th Cir.1994), the agency modified its approach to further an existing policy, which included not just the providing of recreational opportunities but also the consideration of "public safety, resource protection and the avoidance of visitor conflicts." 52 Fed.Reg. at 10681.

Third, even accepting plaintiffs' argument on its own terms, this case is distinguishable from *State Farm* in that here the NPS did provide a rational and principled analysis of its decision to amend 36 C.F.R. section 4.30. *See also Northwest Motorcycle Assn.*, 18 F.3d at 1480 (change in policy by the agency is to be upheld where the policy change is

"based on a rational and principled reason"). In its announcement of the final rule adopting section 4.30, NPS stated:

This section is a revision of the former section 4.3 and provides that the use of bicycles is allowed in park areas under the same basic conditions as are motor vehicles, i.e. on park roads, in parking areas, and on routes designated for their use. These provisions reflect the facts that the NPS generally considers bicycle use a very appropriate, low impact method for visitors to enjoy park areas, but that certain limitations on their use are necessary and appropriate in the interest of public safety, resource protection, and the avoidance of visitor conflicts.

. . . .

... The NPS has determined that the designation of a bicycle route outside of such developed areas, in areas whose primary purpose and land uses are related more to the preservation of natural resources and values, would have a much greater potential to result in adverse resource impacts or visitor use conflicts. This paragraph therefore provides for a much more stringent decision making process for such a proposal by requiring a formal rulemaking. Such a process will provide for a thorough review of all environmental and visitor use considerations and assure the superintendent of having had the benefit of public review and comment before making a decision on any proposed designation.

52 Fed.Reg. at 10681. NPS thus realized that it was imposing "certain limitations" on bicycle use but supported that decision by reference to the principles of "public safety, resource protection, and the avoidance of visitor conflicts." Further, to the extent that its decision was based upon the elimination of management categories, NPS noted in its response to a comment that the elimination of management categories had been agency policy since 1978 and referred to a change in NPS's general regulations in 1983-84 in which the reasons for this policy were set out at length. 52 Fed.Reg. at 10671. In its "background" discussion, NPS noted that "The evolution of the National Park System,

new statutory authorities and directions, . . . [and] modifications in recreation and visitation patterns . . . have all contributed to rendering many of the existing NPS regulations unnecessary, ineffective and/or otherwise outdated. This rulemaking represents an effort on the part of the NPS to strengthen its overall traffic safety program and, in the process, to update and clarify certain of its traffic regulations and delete others that are unnecessary." 52 Fed.Reg. at 10670.

Therefore, even assuming arguendo that NPS's decision to revise section 4.30 represents a reversal of policy, NPS has provided the "reasoned analysis" necessary to support such a change. *State Farm*, 463 U.S. at 57, 103 S.Ct. at 2874. This reasoned analysis by NPS, discussing and balancing relevant conflicting policies, further forecloses any argument that this regulation is "arbitrary" under *Chevron*. Finally, even such a "changed" position still stems from a permissible (if not mandated) interpretation of the Organic Act.

Therefore, this Court has no basis on which to find that 36 C.F.R. section 4.30 as amended is invalid in light of the National Park Service Organic Act.

### 2. NEPA

Plaintiffs also challenge the 1987 rulemaking on the basis that NPS did not prepare an Environmental Impact Statement (EIS) or even an Environmental Assessment (EA) in the course of amending 36 C.F.R. section 4.30. Defendants argue that no EIS was needed because this rulemaking was not a

major federal action having a significant impact on the quality of the human environment, and that no EA was needed because this rulemaking fell within an appropriate categorical exclusion.

 The Court reviews an agency decision not to prepare an EIS under an "arbitrary or capricious" standard. *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir.1993); *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1350 (9th Cir.)[, *amended and superseded on denial of reh'g*, 14 F.3d 1324 (9th Cir.1992) ]. This standard also applies to an agency's determination that a particular action falls within one of its categorical exclusions.[5] *Citizens For the Scenic Severn River v. Skinner*, 802 F.Supp. 1325, 1333 (D.Md.1991)[, *aff'd*, 972 F.2d 338 (4th Cir.1992) ]; *see also Jones v. Gordon*, 792 F.2d 821, 827–29 (9th Cir.1986)(applying the standard for reviewing a decision not to prepare an EIS (at that time, for "unreasonableness") to a decision that an agency action fell within one of its categorical exclusions).[6]

NPS determined that the 1987 rulemaking did not require the preparation of an EA or an EIS because it was categorically excluded by departmental regulations in 516 DM 6 (49 Fed.Reg. 21438), in that this rulemaking was "not expected to:

 (a) Increase public use to the extent of compromising the nature and character of the area or causing physical damage to it;

 (b) Introduce noncompatible uses which might compromise the nature and charac-

---

**5.** Plaintiffs also appear in their briefs to assail the validity of NPS's categorical exclusions, arguing that they are somehow inconsistent with NEPA and with CEQ guidelines. NPS promulgated its regulations adopting these categorical exclusions in 1984. *See* 49 Fed.Reg. 39233 (Oct. 4, 1984). Plaintiffs did not challenge them at that time and plaintiffs are time-barred in any event from challenging this promulgation now. 28 U.S.C. section 2401(a). These categorical exclusions are therefore indisputably valid regulations under NEPA. An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious.

**6.** Plaintiffs assume in their briefing that the *Jones v. Gordon* standard has survived *Greenpeace Ac-*

*tion* and *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989). Since the same ultimate decision underlies both the decision not to prepare an EIS and the decision that an action falls within a categorical exclusion—that the underlying action is not a major federal action having a significant impact on the environment— it seems that the same standard of review— arbitrary and capricious—would apply.

 Under the facts of this case, the standard of review is not determinative. As discussed below, the NPS decision that the 1987 regulation fell within a categorical exclusion was reasonable and would thus survive under either the "unreasonableness" or the "arbitrary and capricious" standard of review.

teristics of the areas, or cause physical damage to it;

 (c) Conflict with adjacent ownerships or land uses; or

 (d) Cause a nuisance to adjacent owners or occupants."

52 Fed.Reg. at 10682.

Plaintiffs argue that the changes to section 4.30 [7] result in this rulemaking falling outside this categorical exclusion.

#### a. *Waiver* [omitted]

#### b. *Arbitrary and Capricious*

 ... [T]his Court cannot find that NPS's determination that this rulemaking fell within a categorical exclusion was arbitrary or capricious. Rather, the determination was eminently reasonable. The closing of off-road areas to bicycle use (pending further particularized determinations of whether it is appropriate in particular cases) clearly falls within the categorical exclusion relied upon by NPS. This rule could reasonably be expected not to "increase public use to the extent of compromising the nature and character of the area" nor to "introduce noncompatible uses which might compromise the nature and characteristics of the area" nor to affect in any way adjacent land owners or land uses. Plaintiffs' arguments to the contrary border on sheer speculation. Plaintiffs suggest that the closing of trails might force bicyclists to ride in other areas, thereby compromising the nature of those areas.[8] However, the regulation makes clear that riding in any other non-developed area is also forbidden; the suggestion that closing trails will force bicyclists to break the law by riding on similarly closed protected areas is not con-

vincing. To the extent that closing all off-road areas to bicycle use will force bicyclists onto paved roads more, it would not be arbitrary (or unreasonable) for the NPS to have concluded that this increased use of the paved roads and developed areas would not "compromis[e] the nature and character of the area or caus[e] physical damage to it," 52 Fed.Reg. at 10682, particularly in light of NPS's finding that "bicycle use [is] a very appropriate, low impact method for visitors to enjoy park areas." 52 Fed.Reg. at 10681. The new regulation in no way introduces any new use to the park system, much less an incompatible use. Nor does it in any way affect adjacent landowners. Plaintiffs' suggestion that the regulations would somehow force off-road bicyclists to trespass [9] on the property of adjoining landowners is unavailing; the agency should no more assume that citizens will violate any other law than that they will violate the regulation being promulgated.

 ■ NPS's determination that its amendment of section 4.30 fit within a categorical exclusion and did not significantly impact the environment was reasonable and was not arbitrary and capricious. Therefore, NPS satisfied its obligations under NEPA when it reasonably determined that the categorical exclusion applies. It had no obligation to prepare an EA or an EIS.

Thus, all of plaintiffs' challenges to the 1987 promulgation of 36 C.F.R. section 4.30 fail.[10]

### B. *THE 1992 GGNRA TRAIL PLAN*

Plaintiffs also challenge the 1992 GGNRA trail plan promulgated by NPS. After a series of hearings conducted by GGNRA offi-

---

**7.** Plaintiffs do not argue that any other aspect of the 1987 rulemaking caused it to fall outside the categorical exclusions.

**8.** Plaintiffs argue in their opposition brief: "Furthermore, closure will inevitably divert bicyclist traffic to other areas which could 'introduce noncompatible uses which might compromise the nature and characteristics' " of these areas.

**9.** Plaintiffs in their opposition brief argue that the diversion of bicycle traffic away from areas closed by the 1987 regulation, " 'may conflict with adjacent ownerships or land uses' or 'cause

a nuisance to adjacent owners or occupants.' " It is difficult to read this argument as anything other than one that closing some trails might tempt bicyclists to ride instead on the property of adjoining landowners.

**10.** Plaintiffs raise numerous arguments (or hints at arguments) throughout their papers that are not explicitly addressed by this Order. Any arguments raised by plaintiffs but not explicitly addressed herein have been considered and analyzed and determined to be without merit.

cials, NPS proposed a rule designating GGNRA trails for various uses and published this proposed rule in the Federal Register on January 29, 1992. 57 Fed.Reg. 3392. The final rule was announced on December 11, 1992. 57 Fed.Reg. 58711. The change was codified at 36 C.F.R. section 7.97(c). In stark contrast to plaintiffs' lack of participation in the 1987 rulemaking process, plaintiffs were intimately involved with every step of the development of the GGNRA trail designation plan—a process that consumed approximately five years.

GGNRA is established by statute at 16 U.S.C. section 460bb. This section also provides the purposes for which the Secretary of the Interior, through NPS, should manage GGNRA:

> In the management of the recreation area, the Secretary of the Interior (hereinafter referred to as the "Secretary") shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management. In carrying out the provisions of this subchapter, the Secretary shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area.

16 U.S.C. section 460bb. The GGNRA subchapter further provides:

> The Secretary shall administer the lands, waters and interests therein acquired for the recreation area in accordance with the provisions of sections 1 and 2 to 4 of this title, as amended and supplemented, and the Secretary may utilize such statutory authority available to him for the conservation and management of wild life and natural resources as he deems appropriate to carry out the purposes of this subchapter.

16 U.S.C. section 460bb–3(a). "Sections 1 and 2 to 4 of this title" of course refers to the National Park Service Organic Act, 16 U.S.C. sections 1 and 2 to 4 (discussed at length above). Thus, in order to open unpaved trails or other undeveloped areas for bicycle use, the Secretary had to comply with 36 C.F.R. section 4.30 and therefore promulgate as a special regulation the trail designation plan and reach "a written determination that such use is consistent with the protection of a park area's natural, scenic, and aesthetic values, safety considerations and management objectives and will not disturb wildlife or park resources." 36 C.F.R. section 4.30(a). In announcing the final rule, the Secretary did make such a written determination. 57 Fed.Reg. 58711.

Plaintiffs challenge the final trail plan. They allege that the agency action was arbitrary and capricious in violation of the APA. They also allege that NPS violated NEPA by failing to prepare an EIS. In order to address these claims, a detailed discussion of the process leading to this final trail designation plan is appropriate.

On January 7, 1988, in response to the revised 36 C.F.R. section 4.30, GGNRA officials presented a draft bicycle use plan at a GGNRA Advisory Commission meeting. People at the meeting expressed concern both over the restriction of mountain bike access resulting from this plan[11] and over potential further user group conflicts resulting from any continued bicycle access within the trail system. To address these concerns, an Ad Hoc Bicycle Trail Subcommittee was established to review the trail system and make a recommendation for designation of bicycle trails. This Subcommittee consisted of two members each of the bicycling, hiking, and equestrian constituencies. The Subcommittee presented both a majority and a minority report to the Marin committee of the Advisory Commission in May of 1988.

In March of 1990, NPS developed an EA considering each of four alternate trail desig-

---

**11.** As noted above, GGNRA officials had chosen to not enforce 36 C.F.R. section 4.30 (and to thus allow full access for mountain bicycles) until there was completed a trail designation plan. Thus, instead of posting signs on June 1, 1987 to the effect that all unpaved trails were closed to bicycles until designated open, GGNRA officials allowed unimpeded access despite section 4.30's prohibition. Therefore, any trail designation plan that did not grant total access to all trails for bicycles would be perceived by the bicyclists as a restriction on their trail access.

nation plans ranging from no trail access to nearly total trail access for bicycles.[12] This EA considered both the majority and the minority reports of the Subcommittee, with some minor modifications, as two of the four alternatives.

In November of 1990, the GGNRA staff issued a report on the March 1990 EA. In developing its report, the staff held four public hearings, held three individual user group workshops (one each for bicyclists, hikers, and equestrians), considered hundreds of letters from individuals and dozens of letters from organizations, heard the testimony of dozens of individuals at both the public hearings and the subsequent GGNRA Advisory Commission meetings, and considered observations and views of experts and staff members. The staff report discussed in detail the various constituent positions and the staff recommendations regarding the purposes of the park, safety and visitor enjoyment, environmental issues and concerns, and the need for a useable trail system. The staff report continued in great detail to spell out recommendations regarding how each particular trail in the park should be designated. The staff recommendations included significantly more trails open to bicycle use than had been provided for in the original 1988 plan. This staff report was itself circulated for public review and comment.

Pursuant to the review and comment on the EA and the staff report (which ultimately became the NPS proposed trail designation plan), a "supplemental environmental assessment and finding of no significant impact" ("SEA/FONSI") was completed in May of 1991. It concluded that allowing bicycle use of trails as provided in the staff report "is consistent with the protection of the natural, scenic, aesthetic values, safety considerations and management objectives of the GGNRA, and will not disturb wildlife or park resources" and that "the proposed project is not a major federal action significantly affecting the quality of the human environment, nor is it one without precedent or similar to one which normally requires an [EIS]." The "SEA/FONSI" also discussed in detail the changes in trail designations and the reasoning behind and the impacts of opening and not opening some particular trails.

In January of 1992, the final trail plan was published in the Federal Register as a proposed special regulation, and public comment was solicited. Again, voluminous and spirited public comment was received.

In December of 1992, NPS published a Federal Register notice adopting as a special regulation the final Trail Use Designation Plan. 57 Fed.Reg. 58711. This publication included detailed responses to public comments that had been received.

### 1. Arbitrary and Capricious

 Plaintiffs argue that the final plan as adopted is arbitrary and capricious because it is based on inadequate data, that no rational connection is established between the data found and the results reached, that the NPS failed to consider relevant criteria, and that the resulting plan is inconsistent with (and therefore an impermissible construction of) the GGNRA Act. Specifically, plaintiffs focus upon four arguments:[13] (1) NPS failed to give sufficient consideration to the recreation criterion in reaching its decision, (2) this failure results in the plan being inconsistent with the GGNRA Act in that "recreation" is not recognized as the paramount interest, (3) NPS lacked data or a rational basis upon which to determine that its goal of resource-protection would be served by closing[14] particular trails to bicycle use, and (4)

---

12. Each of the four alternatives included identical degrees of trail access for hikers and equestrians. Therefore, the only real distinction among these alternatives was the availability of differing degrees of bicycle trail access.

13. Again, as with the discussion of the 1987 regulation, plaintiffs raise or suggest several arguments regarding the 1992 plan that are not explicitly addressed in this Order. Such arguments have been considered and analyzed and deemed to be without merit.

14. Of course, since the 1987 regulation is valid, the 1992 trail plan legally *opens* some trails to bicycle use. Whether viewed as the opening or the closing of various trails to various uses, however, the decision to designate various trails for various uses is nonetheless an agency action reviewable under the "arbitrary and capricious" standard of the APA, 5 U.S.C. section 706(2)(A).

NPS lacked data or a rational basis upon which to decide that the goals of "visitor safety" and "reducing user conflict" would be served by closing particular trails to bicycle use.

None of these arguments has merit. The Court will address them in turn.

### a. NPS Carefully Considered Recreation and All Other Relevant Criteria

 Plaintiffs argue that by failing to address the recreational interests of mountain bicyclists, NPS failed to consider a relevant criterion for its decision. An agency decision can be found arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. v. State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867. The GGNRA Act clearly envisions that the park will be operated in a manner which will "provide for recreational and educational opportunities consistent with sound principles of land use planning and management." 16 U.S.C. section 460bb. Therefore, a failure by the NPS to address recreational concerns could be a basis for invalidating agency action.

 The NPS in this case, however, addressed in tremendous detail the recreational interests both of users vis-a-vis resource protection and of users vis-a-vis competing users. Indeed, from the very start NPS (and GGNRA) officials sought participation and comments from at least three major recreational user groups: the bicyclists, the hik-

ers, and the equestrians. A special committee consisting of members of each group was formed to prepare a report, and both the majority and minority committee positions were discussed in the EA and the staff report. Particular concerns of each user group were repeatedly aired both at open hearings and through letters and the comment process. Special user group workshops were held such that each group could further express its concerns to park officials. In short, once it became clear early in the process that environmental concerns would be negligible, recreational issues were by far the predominant concern of NPS and GGNRA officials throughout the development of the Trail Use Designation Plan.

The bicyclists' complaint is that their interests were not given priority. They complain that park officials failed to give adequate consideration to the quality of the mountain bicycling experience in that several "single-track" and "loop" trails were closed to bicycles and that no concern was given the need to accommodate the most skilled bicyclists by providing them steep and difficult trails.

But this complaint is really just a disagreement with the outcome of the process. Park officials clearly considered these factors, and the bicyclists were given abundant opportunities to impress upon park officials these concerns. For example, in the staff report of October 1990, park officials noted:

> Clearly the most controversial aspect of the National Park Service deliberation over trail designations has been the question of whether or not single track trails should be designated for bicycle use. Care

See *Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1253–54 (9th Cir.1979)(treating as reviewable for arbitrariness an NPS action allocating a limited use between competing user groups)[, *cert. denied,* 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980) ].

Further if, as plaintiffs argue, the 1987 regulation were invalid, then the 1992 trail plan would have the effect of closing trails presumed open under the old version of the pertinent regulations (former 36 C.F.R. section 4.3). This closing would be done pursuant to either the former section 4.3 or the independent section 1.5. This agency action of closing particular trails would have to satisfy the arbitrary and capricious standard.

Plaintiffs do not object that the opening of certain trails for their use was arbitrary or inconsistent with any law or regulation. Rather, they challenge only the outcome that certain other trails either remained or were deemed closed to bicycle use.

Therefore, for matters of convenience and to address plaintiffs' arguments on their own terms, this Court will discuss the 1992 trail plan as if it were a decision to close particular trails to bicycle use.

Since nobody has challenged the opening of certain trails for bicycles, a decision that the closing of the other trails was a valid agency action would serve as a full independent basis for upholding the trail plan whether or not the 1987 regulation were found invalid.

has been taken to avoid making a blanket policy decision on this issue by evaluating each individual stretch of trail. Nevertheless, with only one exception, ... no single track trails were found suitable for bicycle use.

Two considerations were key in this evaluation process—user conflicts and resource protection. Nearly all of the single track trails in the Headlands are narrow treads located on extremely steep hillsides. In summarizing public comments, the staff report noted letters from bicyclist organizations emphasizing the desirability of a "single-track" experience. Finally, in the notice of the final rule published in December 1992, NPS again addressed the bicyclists' concern that "the variety and quality of cyclists' experience will be diminished." NPS responded:

Compared with the present unrestricted bicycle use of the park, the proposed regulation will certainly diminish the options of cyclists accustomed to this freedom. However, with access to over 64% of the park's designated trail system, experiences that will remain available to cyclists are numerous and varied. With the exception of the SCA/New Coastal trail, few distinct "places" in the park will be rendered inaccessible to bicyclists.

NPS considered the recreational interests of the bicyclists, just as it considered the interests of the hikers and the equestrians. NPS balanced these interests against what it viewed to be competing interests in resource protection and visitor safety, as well as the recreational desires of hikers and equestrians to have access to some bicycle-free trails. Whether or not plaintiffs agree with the result they cannot accurately contend that NPS failed to even consider recreational interests when it promulgated the 1992 trail plan.

b. *The Final Trail Plan is Based Upon a Permissible Interpretation of the Relevant Legislation*

Plaintiffs argue that NPS, by compromising the recreational interests of mountain bicyclists, based its trail plan on a statutory interpretation inconsistent with the mandate of the GGNRA Act that the park be operated for recreational purposes. As noted above, an agency action based upon an impermissible construction of a statute is invalid. *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–82. Plaintiffs argue that any construction of the GGNRA Act that does not recognize recreation as the primary purpose of the Act is such an impermissible construction.

 This argument fails. The GGNRA Act does not require that recreational opportunities be provided in complete derogation of any other interests. Rather, the Act specifically provides that recreational opportunities be provided "consistent with sound principles of land use planning and management" and that "In carrying out the provisions of this subchapter, the Secretary shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C. section 460bb. Further, the Secretary is commanded to administer GGNRA "in accordance with the provisions of sections 1 and 2 to 4 of this title," the NPS Organic Act discussed above (which as noted above includes as an overarching concern the goal of resource protection); and the Secretary "may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter." 16 U.S.C. section 460bb–3. For NPS to consider factors other than recreation and to temper recreational uses by its concern for resource protection and visitor safety is not indicative of an impermissible construction of the GGNRA and NPS Organic Acts.

Further, the GGNRA Act in no way mandates that any particular type of recreation be given primacy over other types. There is simply nothing in the GGNRA Act or the NPS Organic Act requiring the NPS to give bicyclists unfettered reign of the park without regard to the recreational interests of those whose chosen mode of recreation is inconsistent with such unfettered reign. These statutes certainly do not mandate the interpretation that bicycles must be allowed to roam free through the park. Since a contrary interpretation—that NPS has the

authority to regulate and allocate recreational uses among user groups—is clearly permissible, *see Kleppe*, 608 F.2d at 1253 ("Allocation of the limited use between two groups ... is well within the area of administrative discretion granted to the NPS"), and since the 1992 trail plan is based upon such an interpretation of the statutory scheme, this Court must uphold the validity of the Plan as based upon a permissible statutory construction.

### c. NPS Reasonably Relied Upon Evidence Showing That Restricting Mountain Bicycle Access Would Serve the Goal of Resource Protection

Plaintiffs argue that NPS lacked sufficient evidence upon which to conclude that bicycle use of certain of the closed trails was inconsistent with resource protection. Further, plaintiffs argue that the NPS failed to articulate a reasoned connection between any evidence of resource damage and the decision to close particular trails. "In order for an agency decision to be upheld under the arbitrary and capricious standard, a court must find that evidence before the agency provided a rational and ample basis for its decision." *Northwest Motorcycle Assn.*, 18 F.3d at 1471. "After considering the relevant data, the [agency] must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (citations omitted).

As noted above, one rationale for the closing of particular trails to bicycle use was that doing so served the goal of resource protection (another rationale, to promote safety and avoid user conflict, is discussed below).[15] Therefore, in order to uphold this agency action of promulgating the trail plan on the basis of resource protection, this Court must find that ample evidence supported the agency's findings of resource

damage and that the agency articulated a reasoned connection between stemming this resource damage and its decision to prevent bicycle use of some trails.

The staff report and the environmental assessments addressed the impact on natural resources from permitting bicycle use on park trails. Two resource protection concerns were addressed by park officials as supporting restricted bicycle use. First, park officials noted serious erosion problems on certain steep narrow trails and determined that restricting bicycle use would slow such erosion. Second, park officials noted that on narrow trails bicyclists passing other users would either leave the trail or force the other users off the trail to the detriment of off-trail vegetation and wildlife.[16]

Regarding erosion, NPS conducted a "GGNRA Erosion Rehabilitation Survey" in 1990 detailing significant erosion problems with several of the GGNRA trails, particularly the steep and narrow ones. This erosion problem was further documented by numerous reports in letters and testimony of users and staff who had observed this erosion. While bicyclists insisted that the erosion was caused by poor trail maintenance and not by bicycle use, park officials noted in the staff report that "A great deal of conflicting opinion was received regarding the effects of bicycles and/or horses on soil erosion and trail damage" but that most agree, however, that trail maintenance needs are increased by both of these activities. In the original EA, NPS found that "Downhill bicycle travel on steep slopes is usually accompanied by braking and often by skidding which tends to push dislodged surface gravels into ditches, water bars, and drains. Heavy bicycle use on steep trails usually requires that these ditches, water bars, and drains be cleared more frequently than those used by hikers and equestrians only." Detailed letters and reports in the administrative record evidence

---

15. A third rationale—that other users desired some bicycle-free areas—was also mentioned by NPS. In light of the hundreds of letters and comments by such users to this effect, plaintiffs cannot and do not challenge this finding by NPS.

16. Plaintiffs argue repeatedly that the plant life NPS was trying to protect—Coastal Rock Cress

and certain lupine plants supportive of Mission Blue Butterfly habitat—was not classified as endangered or protected. Whether or not this is true, the goal of resource protection can certainly support the protection of natural plant life resources that have not yet descended to endangered status.

user and staff experience supporting this finding that bicycle use exacerbates steep trail erosion. While many bicyclists seem to express disagreement with this finding and argue that bicycle use does not cause erosion, the NPS is not required to embrace the bicyclists' evidence and is free in its exercise of expertise to give conflicting evidence whatever weight it deems appropriate in light of the accuracy and credibility of such evidence. As long as ample evidence supports the NPS determination, this Court is not free to substitute its judgment for that of the agency. There is ample evidence throughout the administrative record of an erosion problem on certain GGNRA trails and of bicycle use exacerbating this problem. Therefore, plaintiffs' argument that this finding is unsupported by the evidence must fail.

Regarding the damage to plant life, the administrative record is again replete with letters and reports indicating that when bicyclists pass hikers or equestrians on narrow trails at least one of the users is forced off of the trail and onto surrounding plant life. This is not surprising since the administrative record also includes evidence that mountain bicycle handlebars are often as wide as 24 inches across while some of the single track trails are as narrow as 18 to 36 inches across. Even on slightly wider paths, there is evidence that bicyclists often occupy the center of the trail and travel in groups, thus further limiting the space available for other users when the bicyclists pass them. Further, there was evidence that many bicyclists had difficulty staying on the trails where the steepness of the trail caused high speeds and the narrowness of the trails gave little margin for error and made sharp turns difficult. Park staff and visitors reported that bicyclists on these steep narrow trails often skidded to control their speed, slid off of trails on sharp turns, or cut across off-trail areas at certain "switch-backs." Finally, there was abundant evidence that this trampling of off-trail vegetation was damaging the plant life;

this evidence included not only numerous letters and reports by users and staff but also a study commissioned by plaintiff Bicycle Trails Council of Marin in which the evaluator found damage to certain Lupine plant species along one narrow trail as a result of trampling by park users.[17] Therefore, there was ample evidence in the administrative record from which NPS could reasonably conclude that bicycle use of certain trails resulted in trampling of and damage to the park's natural plant life resources.

After determining that NPS had ample evidence upon which to find that bicycle use contributed to resource damage (in the form of erosion and trampled vegetation), the next question is whether the agency articulated a reasoned connection between these facts found and the final agency action undertaken—closing (or not opening) certain trails to bicycle use. NPS did this.

For example, in discussing why all single-track trails but one were closed to bicycle use, the staff report states: "Two considerations were key in this evaluation process—user conflict and resource preservation. Nearly all of the single track trails in the Headlands are narrow treads located on extremely steep hillsides. In most cases, when a bicycle needs to pass another user, one or the other is required to step or ride off the trail ahead. This obviously results in trampled vegetation and erosion at the trail margins. On the steepest trails, whose alignments run at right angles to these contours, ... unavoidable skidding results from the need to curtail bicycle speed which therefore causes erosion of the trail tread itself." A staff report discussion of why two particular narrow trails were closed noted: "Staff recommendations for each of these trails would restrict their use to hikers only to avoid impacts to [neighboring] sensitive species." Further, in the publication of the final rule NPS cited concerns with erosion and plant life damage as a factor both in its decision to close most single-track trails to bicyclists and in its discussion of 3 of the 4 particular trails

---

17. Since the damaged plant species served as habitat for the endangered Mission Blue Butterfly species, park officials closed this trail upon learning of the damage. Upon consultation with the Fish and Wildlife Service as required under the Endangered Species Act, NPS agreed as a condition of reopening this trail that its use be limited to hikers only and that certain other restrictions be imposed.

mentioned in its response to the comments requesting that certain trails be opened.

Further, throughout the process of developing the EA, the staff report, the SEA/FONSI, the proposed rule, and the final rule, throughout the public hearings and meetings, and throughout the written manifestations of the NPS position as it developed during this five year process, NPS made clear and articulated repeatedly that one of its concerns in restricting bicycle use was that erosion and the trampling of vegetation was curtailed. The number of letters and comments addressing these issues (including letters and comments from plaintiffs and their constituents) make clear that everyone knew that this was a primary concern of NPS. This is not a case where the agency has thought up some rationale after the fact to justify its action. Rather, NPS provided a reasoned articulation of its concern for resource protection and the relationship of its proposed conduct to this issue throughout this rulemaking process.

In summary, the NPS's resource-protection rationale was both supported by ample evidence in the record and reasonably related to the agency action undertaken. This rationale was not pretextual; rather, it was actually supportive of the agency action. The agency repeatedly and reasonably articulated that its action was being undertaken in service of this resource-protection rationale. Under these facts, NPS did not act in an arbitrary and capricious manner.

### d. NPS Reasonably Relied Upon Evidence Showing That Restricting Mountain Bicycle Use Would Reduce User Conflict and Enhance Visitor Safety

Plaintiffs also argue that NPS lacked sufficient evidence upon which it could find that prohibiting bicycle use of certain trails would reduce user conflict and enhance visitor safety. As above, plaintiffs again maintain that this rationale is pretextual and that NPS failed to articulate a reasonable connection between the facts found and the agency action undertaken.

Ample evidence in the administrative record supports the finding by NPS that bicycle access to all trails increases incidents of user conflict and compromises visitor safety. The record includes hundreds of letters from park users recounting stories of collisions or near misses with speeding or reckless bicyclists on all kinds of trails but particularly on steep and narrow trails. Hikers and bird watchers repeatedly told how they have been forced off of trails by speeding bicycles and how they have had their peace and solitude on the trails interrupted by bicycles that—because they are quiet and fast— seemed to appear out of nowhere and be immediately upon the hikers and other users. Equestrians told how their horses have been startled by speeding or oncoming bicycles and have become restless, on several occasions even throwing and injuring experienced riders. Though most users admitted that the great majority of bicyclists were polite and safety-conscious, letters from hikers, equestrians, bird watchers, joggers, and other users also repeatedly recounted incidents of rudeness, threats, and altercations when they have complained to an offending bicyclist about dangerous conduct. Park staff also reported having received such complaints.

Plaintiffs contend that the only credible evidence of user conflict would be a survey or study performed scientifically to determine how many conflicts occur and how and why they occur. Plaintiffs note that the staff report admits: "The number of formally reported accidents involving bicycles on GGNRA Marin trails is small (22 from January 1987–September 1990) and in most cases involve only the cyclist," and that the publication of the final rule echoes this finding. Plaintiffs argue that only by counting accident reports or other objectively verifiable indicators of conflict and risk can NPS arrive at a reasonable conclusion that user conflict and danger exist. Plaintiffs argue that by relying on subjective individual reports of user conflict, NPS allowed its decision making process to be manipulated by non-bicyclists pursuing a political (not safety-based) agenda against bicycles.

The Ninth Circuit recently rejected this identical argument in *Northwest Motorcycle*

*Assn. v. USDA,* 18 F.3d 1468, 1475–77 (9th Cir.1994). As in *Northwest Motorcycle,* here "it appears that the public comments received by the Defendants were the primary basis for the Defendants' finding of 'user conflict.'" *Id.* at 1475. The Ninth Circuit in *Northwest Motorcycle* noted that the plaintiff in that case "strenuously contends that the comments made should be disregarded because the individuals are interested parties and their comments were unverifiable. The Plaintiff would have the Defendants attempt to somehow objectively quantify the extent of conflict." *Id.* at 1475. But the Ninth Circuit rejected this argument and held that subjective reports by park visitors of user conflict could support a reasonable agency determination that such conflict existed:

> Individual comment is a very persuasive indicator of "user conflict," for determining the existence of conflicts between humans cannot be numerically calculated or counted; rather, the existence of conflict must be evaluated. The court can envision no better way to determine the existence of actual past or likely future conflict between two user groups than to hear from members of those groups.

*Id.* at 1475.

NPS in this case definitely "hear[d] from members of those groups." Along with the hundreds of letters received at all stages of the process, NPS received input from hikers, bicyclists, equestrians, and other users through four public hearings, three individual group workshops, the majority and minority reports of an ad hoc bicycle trails subcommittee consisting of representatives of various user groups, and numerous consultations and meetings by park officials with interested groups and individuals and the GGNRA Advisory Commission. NPS's finding that user conflict and visitor danger would be reduced by limiting bicycle trail access in GGNRA was supported by ample evidence.

Further, NPS articulated a reasoned connection between this finding and the final agency decision to close (or not open) some trails to bicycle use. In the publication of the final rule, NPS states: "Notwithstanding the responsible user, bicycles are often perceived by other users as a disruptive influence on park trails. Although most of the few reported bicycle accidents in the park involve only single individuals, letters and reports from hikers and equestrians tell of many close calls and confrontational and unsettling experiences. The amount of bicycle free trails provided under the regulation seems a modest and reasonable response to these concerns." Further, throughout the review and comment period and the publication of the EA, the staff report, the SEA/FONSI, the proposed rule, and the final rule, NPS made clear its reasoning regarding the reduction in bicycle trail access and its relationship to easing user conflict and improving visitor safety. Again, as was the case regarding the resource protection rationale, the safety and conflict rationales have been carefully explained and defended throughout the entire trail plan promulgation process.[18]

Since ample evidence supported the NPS finding that bicycle access to all trails increased user conflict and decreased visitor safety, and since NPS articulated a reasoned connection between these facts and the final agency action of closing some trails to bicycles, this Court cannot find such agency action to be arbitrary and capricious on this basis.

### 2. NEPA and the 1992 Trail Plan

Plaintiffs also challenge the 1992 trail plan on the basis that NPS failed to perform an Environmental Impact Statement (EIS) pursuant to NEPA. An EIS must be prepared whenever there is contemplated a major federal action having a significant impact on the human environment. 42 U.S.C. section 4332(2)(C). Where an Environmental Assessment (EA) is performed, an agency

**18.** Plaintiffs argued that crowding the same number of bicycles onto fewer trails—all of which were to be multi-user trails—would actually increase user conflict and the risk of accident. NPS rejected this argument, finding that the trails designated for bicycle use were not near capacity and that future actions could be taken if congestion became a problem. In any event, this argument by plaintiffs does not affect

decision not to complete an EIS is reviewed under the arbitrary and capricious standard. *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 980 (9th Cir.1993). Under this standard, a reviewing court "still must ensure that an agency has taken a 'hard look' at the environmental consequences of its proposed action, ... carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Inland Empire*, 992 F.2d at 980. Plaintiffs allege that NPS's Supplemental Environmental Assessment finding of no significant impact (SEA/FONSI) was arbitrary and capricious because NPS failed to consider the significant impact on traffic and safety of crowding [19] bicycles that previously occupied 100% of GGNRA trails onto 64% of these trails.[20] Further, plaintiffs allege that the closing of trails will force bicyclists to travel more on paved roads shared with motor vehicles.

Defendants argue that plaintiffs have failed to identify any physical impacts to the environment caused by such crowding, and that plaintiffs' concern with crowding is simply a concern with their bicyclists' subjective

trail experience and fear of an increased risk of accidents. *See Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1982). Plaintiffs counter that impacts on traffic and safety can qualify as impacts on the environment. *Coalition on Sensible Transportation, Inc. v. Dole*, 642 F.Supp. 573, 586 n. 3 (D.D.C.1986)[, *aff'd*, 826 F.2d 60 (D.C.Cir. 1987) ].

As noted above, an EIS need only be prepared for a major federal action having a significant impact on the human environment. The Supreme Court has interpreted the human environment to mean the "physical environment—the world around us, so to speak." *Metropolitan Edison*, 460 U.S. at 772–73, 103 S.Ct. at 1560. Thus NEPA does not require that an agency take into account every conceivable impact of its actions, including impacts on citizens' subjective experiences. Rather, it requires agencies to take into account environmental impacts on the physical "world around us." Plaintiffs' argument that bicyclists being crowded onto fewer trails is such an environmental impact is incorrect. An increased

the quantum of evidence supporting the NPS finding.

19. Plaintiffs argue in passing that this crowding could result in more erosion or more damage to off-trail vegetation—despite their earlier espoused position that bicycle trail access is not harmful to the environment. In any event, NPS considered these impacts, found them non-significant, and discussed methods to mitigate or prevent them in its EA, staff report, SEA/FONSI, and statement of final rule. NPS specifically found that none of the multiuse trails being opened for bicycle use was near capacity and that if future increased use were to cause problems on these trails further mitigation measures would be considered.

20. Plaintiffs do not allege that the opening of the 64% of trails to bicycle use required the preparation of an EIS. Rather, plaintiffs characterize the federal action as closing the other 36% of trails and argue that NPS needed to prepare an EIS regarding the effects of this closure. Thus, plaintiffs argue that despite the 1987 regulations, the status quo was that all bicycles could ride on all trails and any departure from this would have to be justified. Plaintiffs note that NPS in the SEA/FONSI characterized the "no action" alternative as leaving all trails closed. Plaintiffs argue that this wrongly colored the NPS inquiry by

resulting in an analysis only of the impact of opening 64% of the trails and not of the impact of closing 36% of the trails.

Plaintiffs' argument lacks merit. Whether NPS' action is characterized as opening or closing certain trails, the agency found that allowing bicycle use on 64% of GGNRA trails would result in no significant impact to the physical human environment. Any actual effects from allowing all bicyclists to use these 64% of trails would be identical however the action is characterized. For example, the crowdedness of these 64% of trails would be identical either way; the same number of bicyclists could be expected to ride on the same number of trail miles. Whether these 64% of trails are thus made crowded because they are opened to bicycle use or because other trails are closed to bicycle use is irrelevant—the environmental impact, if any, from this crowdedness is the same. If it is significant, an EIS must be prepared either way. The same would be true of trail erosion or any other effect.

Therefore, for matters of convenience and to address plaintiffs' arguments on their own terms, this Court will discuss the action as one of closing certain trails. This in no way indicates that NPS erred in characterizing the "no action" alternative as leaving all trails closed (in fact, in light of this Court's above holding regarding the 1987 regulations, the NPS characterization was correct). It does indicate, however, that the 1992 trail plan could be upheld even were the 1987 regulation to be found invalid.

risk of accident is not an impact to the physical environment. *Metropolitan Edison,* 460 U.S. at 775, 103 S.Ct. at 1561–62 ("A risk of an accident is not an effect on the physical environment. A risk is, by definition, unrealized in the physical world."). Thus, plaintiffs here cannot show as a threshold matter that the 1992 trail plan had any significant impact on the physical environment. The closing of certain trails to bicyclists did not mandate an EIS.

However, even assuming that this crowding results in an environmental impact governed by NEPA, it is clear that NPS did consider and address plaintiffs' precise concerns within its SEA/FONSI as well as its statement of the final rule. In the SEA/FONSI, NPS noted as a "Traffic and Circulation Impact" the "Potential increase in bicycle and equestrian traffic on routes designated for such use." However, the agency found, "There is no indication that these trails are near capacity at this time; monitoring will determine whether use levels are creating congestion or visitor conflicts, and recommend appropriate mitigation." In the statement of final rule, NPS again noted that commentors had identified that "restricting bicyclists to certain trails would increase congestion on these routes," to which NPS responded: "We agree that this will be a result of the proposed regulation. However, compared to the bicycle traffic on trails that occurs as a result of the increasing popularity of mountain bike riding, this is not expected to be significant. According to statistics compiled by the Bicycle Institute of America, mountain bike riders have increased nationwide from 200,000 in 1983 to 20 million in 1991. A 25% increase in mountain bike riders was estimated between 1991 and 1992 alone. Although there is no evidence to suggest that resulting bicycle traffic loads on park trails will have unacceptable impacts, other management actions may be necessary in the future to mitigate against multi-user conflicts."

NPS also noted in its SEA/FONSI that "Bicycle travel on park roads could increase as an alternative to trails which are not designated for bicycle use." NPS recognized in the SEA/FONSI several possible options for mitigating this impact. In the statement of final rule, NPS expanded upon this. Responding to the comment that "closure of trails to bicycles would require bicycles to use roads shared with other motor vehicles and create a potential safety problem," NPS answered:

> Most accidents involving bicycles result in injury to the cyclist only, and do not generally affect other users. Since 1985 there have been 46 reported bicycle accidents on Marin Headlands public roads, and 52 on trails. Although most of the road accidents occurred on Conzelman Road, a route which provides access to Marin Headlands trails for bicycles, very few of these accidents were identified on the segment of road that leads to the nearest multiuse trail. This segment was recently widened to provide a safer shoulder to accommodate bicycles in the uphill direction. Many bicyclists on this segment of road have traveled over busy city streets, the Golden Gate Bridge, or other public roads to reach this point. An additional 1 mile of paved road travel is required before entering the trail system, as a result of the closure of the New Coastal Trail to bicycles. This narrow trail has been closed to all users since January 1991 with no detectable increase in bicycle accidents as a result.

Plaintiffs raised their concern over the effects of bicycle traffic congestion on the opened trails and paved roads throughout the trail designation process. NPS had at hand all of plaintiffs' input as well as its own park officials' (and other users') observations and expertise. NPS considered all of the congestion impacts raised by plaintiffs. NPS discussed plaintiffs' concerns as well as the park officials' findings that these impacts would not be sufficiently significant as to justify the preparation of an EIS. NPS articulated in its published positions its reasoned consideration and analysis of plaintiffs' congestion concerns, as well as possible options for mitigating these impacts. Contrary to plaintiffs' argument, NPS carefully considered the congestion issues raised by the bicyclists and reasonably concluded that any resulting impacts on the environment would not be so

significant as to require an EIS. NEPA requires no more than this careful reasoned consideration.[21] The NPS decision not to prepare an EIS cannot be found arbitrary or capricious.

## IV. CONCLUSION

Both the 1987 regulation and the 1992 trail plan pass review.... [P]laintiffs' challenges to the 1987 regulation fail. The 1987 change to 36 C.F.R. section 4.30 so as to eliminate the less restrictive recreation unit rule was mandated by Congressional amendments to the Organic Act. It was in any event at least based upon a permissible construction of that statute; and the adoption of the closed-unless-designated-open rule was not arbitrary but was rather based upon a reasoned discussion of conflicting policies. Plaintiffs' NEPA challenge to the 1987 regulation likewise fails ... on the merits.

The 1992 trail plan was promulgated through a careful and rigorous rulemaking in which all of plaintiffs' concerns were voiced by plaintiffs and other bicyclists, in which park officials gave reasoned consideration to all of the concerns raised by plaintiffs as well as those raised by other interested park users, and in which NPS conscientiously performed all of the procedural requirements imposed by the APA and NEPA. The agency struck a reasoned balance among the sometimes competing goals of recreation, safety, and resource protection as well as among the sometimes competing recreational interests of bicyclists and other park visitors. The authority of NPS to strike such balances in a reasoned manner inheres in the Organic Act and the GGNRA Act. To call such agency action arbitrary and capricious simply because one disapproves of the outcome reached would be to distort the purposes of APA and NEPA. Plaintiffs' challenges to the 1992 trail plan fail.

For the reasons stated above, defendants' motion for summary judgment is GRANTED. Plaintiffs' cross-motion for summary judgment is accordingly DENIED. Plaintiffs' complaint is dismissed with prejudice. The Clerk of the Court shall close this file.

IT IS SO ORDERED.

---

**21.** NEPA imposes only procedural requirements and does not dictate a substantive environmental result. "The policy behind NEPA is to ensure that an agency has at its disposal all relevant information about environmental impacts of a project before the agency embarks on the project." *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346 (9th Cir.1994).

Further, courts "defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor, 'consideration of which was essential to a truly informed decision whether or not to prepare an EIS.'" *Inland Empire,* 992 F.2d at 981. [citation omitted]. Here, plaintiffs can point to no relevant factor that NPS "completely failed to address."