**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 15 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

_____

SOUTHERN UTAH WILDERNESS
ALLIANCE, a non-profit corporation,

     Plaintiff-Appellee,

v.

WALT DABNEY, in his official
capacity as superintendent for
Canyonlands National Park; JOSEPH
ALSTON, in his official capacity as
superintendent of Glen National
Recreation Area; JOHN E. COOK, in
his official capacity as Regional
Director,

     Defendants-Appellees,

UTAH SHARED ACCESS
ALLIANCE, formerly known as Utah
Trail Machine Association; BLUE
RIBBON COALITION; HIGHT
DESERT MULTIPLE USE
COALITION; UNITED FOUR
WHEEL DRIVE ASSOCIATIONS OF
U.S. & CANADA; HISTORIC
ACCESS RECOVERY PROJECT,

  Defendants-Intervernors-Appellants,

and

NATIONAL PARKS AND
CONSERVATION ASSOCIATION,

     Amicus Curiae.

No. 98-4202

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CV-559-K)**

Heidi J. McIntosh (Stephen H.M. Bloch with her on the brief), of Southern Utah Wilderness Alliance, Salt Lake City, Utah, for Plaintiff-Appellee.

John T. Stahr, Attorney, Department of Justice (Lori J. Schiffer, Assistant Attorney General; Paul M. Warner, U.S. Attorney; Stephen L. Roth, Assistant U.S. Attorney; Evelyn S. Ying, Attorney, Department of Justice; and K.C. Becker, Attorney Advisor, Office of the Solicitor, Department of the Interior, with him on the brief), for Defendants-Appellees.

David Andrew Wight (William Perry Pendley with him on the brief), of Mountain States Legal Foundation, Denver, Colorado, for Defendants-Intervernors-Appellants.

William J. Lockhart, Salt Lake City, Utah, filed an amicus curiae brief for the National Parks and Conservation Association.

Before **SEYMOUR**, Chief Judge, **BRORBY** and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff-Appellee Southern Utah Wilderness Alliance ("Wilderness Alliance") challenged portions of a National Park Service ("NPS") backcountry management plan ("BMP") that affected access to areas of Canyonlands National

Park in Utah.[1] Wilderness Alliance alleged that the BMP violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370; the National Park Service Organic Act ("the Organic Act" or "the Act), 16 U.S.C. §§ 1-18(j); and the Canyonlands National Park Enabling Act, 16 U.S.C. § 271. Utah Shared Access Alliance ("Utah Shared Access"),[2] a combination of groups supporting four-wheel drive vehicle recreation, intervened as defendants. On cross motions for summary judgment by Wilderness Alliance and the federal defendants, the district court upheld most of the BMP, but found in favor of Wilderness Alliance on its claim that the BMP's continued allowance of motorized vehicles on a ten-mile portion of the Salt Creek Jeep Road from Peekaboo Spring to Angel Arch was inconsistent with a clear legislative directive of Congress. See Southern Utah Wilderness Alliance v. Dabney, 7 F. Supp.2d 1205, 1211 (D. Utah 1998). On September 23, 1998, the district court entered a final judgment order granting judgment to Wilderness Alliance with respect to the ten-mile segment. The

---

[1]The defendants in the action in the district court included the following, collectively referred to in this appeal as the "federal defendants": Walt Dabney, in his official capacity as superintendent for Canyonlands National Park; Joseph Alston, in his official capacity as Superintendent of Glen Canyon National Recreation Area; John Cook, in his official capacity as Regional Director; and the NPS.

[2]At the time it intervened, Utah Shared Access was known as the Utah Trail Machine Association.

judgment remanded the case to the NPS for appropriate action in accordance with the judgment, and enjoined the NPS from allowing motorized vehicle travel in Salt Creek Canyon above Peekaboo Spring.

Utah Shared Access, the intervenor below, now appeals the district court's decision with respect to the ten-mile portion of the Salt Creek Road. Interestingly, the federal defendants did not appeal the district court's decision; however, they did submit a brief to this court "to advise the Court of the Department's views as to the proper legal construction of the [Organic] Act." In that brief, they take a position different from the position taken in the district court. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we REVERSE and REMAND.

## I. BACKGROUND

In 1992, the NPS began developing a BMP for Canyonlands National Park and the Orange Cliffs Unit of Glen Canyon National Recreation Area in Utah. The goal of that plan as articulated by the NPS was "to develop backcountry management strategies to protect park resources, provide for high quality visitor experiences, and be flexible to deal with changing conditions." The plan was being developed in response to growing visitation to the areas, which had increased the impact on resources and diminished the quality of visitor experience.

One of the areas on which the plan was to focus was the area that is the subject of this appeal, a portion of Salt Creek Canyon. According to the NPS, the Salt Creek Road is a vehicle trail that runs in and out of Salt Creek, the only year-round, fresh water creek in Canyonlands National Park other than the Colorado and Green Rivers. There is no practical way to reroute the road to avoid the water course. To navigate this road safely, a high clearance four-wheel-drive vehicle and some experience in four-wheel driving, or the participation in a commercially guided tour, is necessary. The NPS found that it was receiving numerous requests every year for assistance in removing vehicles that broke down or became stuck on the Salt Creek Road. In addition, there were several instances every year of vehicles losing transmission, engine, or crankcase fluids in the water. The NPS became concerned with the adverse impacts inherent in the existence of a road and vehicle traffic in this narrow riparian corridor. A Notice of Intent to prepare a BMP was printed in the Federal Register. See Backcountry Management Plan, Environmental Assessment; Canyonlands National Park, UT, 57 Fed. Reg. 27,268 (1992) (notice of intent). The NPS solicited possible solutions to the problems in the area, and hosted public discussions in Utah and Colorado in late 1992 and early 1993.

On December 18, 1993, the NPS released a draft environmental assessment ("EA") that described NPS's current policies, alternatives for change, and the

environmental consequences of the alternatives described, including the alternative of taking no action. The EA identified the NPS's preferred alternative for each of the various problems. With respect to the problems on the trail in Salt Creek Canyon, the preferred alternative was to close the Salt Creek Road to vehicles after a particular landmark, Peekaboo Spring, leaving ten miles to be traversed by foot before reaching Angel Arch, a well-known landmark and popular destination among four-wheel drivers. During the EA's review period, the NPS held numerous public meetings. At the close of the review period in March 1994, the NPS noted that the proposal sparking the most debate was the closure of the ten-mile portion of the Salt Creek Road.

The final BMP, released on January 6, 1995, adopted an alternative that did not close the ten-mile portion of the Salt Creek Road; instead, it closed a one-half mile segment of the road and left the rest open to vehicles on a limited permit system.[3] Wilderness Alliance subsequently filed a complaint in federal district

---

[3]The relevant portion of the BMP stated as follows:

Salt Creek and Horse Canyon four-wheel drive roads in the Needles District will remain open to vehicular traffic, but travel will be by backcountry use permit only. A locked gate at the north end of the road (the location of the current gate) will control access. Day use permits for Salt Creek and Horse Canyon will be limited to ten (10) permits for private motor vehicles (one vehicle per permit), two (2) permits for commercial motor vehicle tours (one vehicle per permit), one (1) or more permits for up to seven (7) private or commercial

(continued...)

court challenging several of the NPS's decisions in the BMP, including the decision to permit continued vehicle access to Salt Creek Canyon above Peekaboo Spring. Wilderness Alliance argued that by approving the BMP and sanctioning continued vehicle-caused degradation in that area, the NPS violated the APA, NEPA, the Organic Act, and the Canyonlands National Park Enabling Act. Wilderness Alliance sought declaratory and injunctive relief. Utah Shared Access intervened as defendants, opposing the closure of Salt Creek Canyon to vehicle access.

The federal defendants and Wilderness Alliance each moved for summary judgment, and Utah Shared Access filed a response to Wilderness Alliance's motion for summary judgment.[4] Although the district court ruled in favor of the

---

[3](...continued)
bicyclists, one (1) or more permits for up to seven (7) pack or saddle stock. . . . All permits are available through the advance reservation system. Unreserved permits or cancellations will be available to walk-in visitors.

Canyonlands National Park and Orange Cliffs Unit of Glen Canyon National Recreation Area, Backcountry Management Plan, at 13 (January 6, 1995).

[4]This court has held that the use of summary judgment procedures by the district court "is inconsistent with the standards for judicial review of agency action under the [Administrative Procedure Act]" primarily because summary judgment "permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994). Rather, the district court's review of agency actions "must be processed *as appeals*." Id. at 1580. Here, the parties' use of, and the district court's

(continued...)

federal defendants on most of the challenged portions of the BMP, it ruled in favor of Wilderness Alliance on its challenge to the portion of the BMP that left the ten-mile segment of the Salt Creek Road from Peekaboo Spring to Angel Arch open to vehicles. See Southern Utah Wilderness Alliance, 7 F. Supp.2d at 1211-12. The district court held that the Organic Act and the Canyonlands enabling legislation preclude the NPS from authorizing activities that permanently impair unique park resources. See id. It then determined, based on the administrative record, that such a permanent impairment would occur from the continued use by motorized vehicles of this ten-mile segment. See id. at 1212. In an order filed September 23, 1998, the district court vacated the BMP's decision to allow motorized vehicle use in the ten-mile segment, remanded to the NPS for appropriate action in accordance with the judgment, and enjoined the federal defendants from permitting or otherwise allowing motorized vehicle travel in Salt Creek Canyon above Peekaboo Spring.[5]

_____

[4](...continued)
acceptance of, the summary judgment procedures resulted in no harm to either party. The district court's review of the NPS's decision was fundamentally consistent with the review procedures established by the Tenth Circuit.

[5]The district court also rejected three specific challenges by Wilderness Alliance to the NPS's EA and its decision to issue a Finding of No Significant Impact ("FONSI"). Those three challenges were (1) that the NPS failed to consider an adequate range of alternatives, (2) that the NPS failed to discuss the permit system that was eventually adopted, and (3) that the NPS failed to analyze adequately the impact of off-road vehicle use in areas other than in the Canyons.

(continued...)

On appeal, Utah Shared Access argues that (1) the BMP does not violate the National Park Service Organic Act and the Canyonlands enabling legislation, and (2) the district court abused its discretion by enjoining the BMP's implementation in Salt Creek Canyon. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand.

## II. DISCUSSION

### A. Standard of Review

"We review de novo a district court's decision regarding an agency action." Public Lands Council v. Babbitt, 154 F.3d 1160, 1166 (10th Cir. 1998), aff'd 120 S. Ct. 1815 (2000) (citation omitted). When the question before us involves an agency's interpretation of a statute it administers, we utilize the two-step approach announced in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed.2d 694 (1984). When Congress has spoken to the precise question at issue, we must give effect to the express

---

[5](...continued)

See Southern Utah Wilderness Alliance, 7 F. Supp.2d at 1212-14. The NPS's FONSI addressed only the final BMP, which, as relevant to this appeal, allowed a maximum of twenty vehicles per day in the pertinent area of Salt Creek Canyon. None of the parties appear to have explicitly put at issue the conclusion in the FONSI that the final BMP's permit system for the Salt Creek Canyon area "will not have a significant effect on the human environment" and that "[n]egative environmental impacts that could occur are minor and temporary in effect." (Aple. Supp. App. at 38.) Thus, the conclusion in the FONSI was not an issue in the district court and is not an issue before us on appeal.

intent of Congress. See Chevron, 467 U.S. at 842-43. If the statute is silent or ambiguous, however, we defer to the agency's interpretation, if it is a permissible one. See id. at 843-44.

Under the Administrative Procedure Act ("APA"), "[i]nformal agency action must be set aside if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Olenhouse, 42 F.3d at 1573-74 (internal quotations omitted); 5 U.S.C. § 706(2).

"We review the district court's grant of an injunction for abuse of discretion." Ross v. Federal Highway Admin., 162 F.3d 1046, 1054 (10th Cir. 1998) (citation omitted).

B. The Organic Act and the Canyonlands National Park Enabling Legislation

The provision of the Organic Act relating to the creation of the NPS and the purpose of the national parks it oversees provides:

> The service thus established shall promote and regulate the use of the Federal areas known as national parks . . . by such means and measures as conform to the fundamental purpose of the said parks . . . which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. Another provision of the Organic Act prohibits authorization of activities that derogate park values:

- 10 -

The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a-1.  The enabling legislation creating Canyonlands National Park provides: "In order to preserve an area in the State of Utah possessing superlative scenic, scientific, and archeologic features for the inspiration, benefit, and use of the public, there is hereby established the Canyonlands National Park . . ."  16 U.S.C. § 271.  That legislation also mandates that Canyonlands be administered, protected, and developed in accordance with the purposes of the Organic Act. See 16 U.S.C. § 271d.

In the district court, the NPS asserted that the Organic Act and the enabling legislation creating Canyonlands National Park authorized a balancing between competing mandates of resource conservation and visitor enjoyment, and that its BMP represented a reasonable accommodation of conflicting mandates that should be afforded considerable deference.  See Southern Utah Wilderness Alliance, 7 F. Supp.2d at 1211.  The district court reviewed the agency's interpretation in accordance with the analysis set forth in Chevron, where the Supreme Court stated:

First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that

is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842-43. According to the district court, the first Chevron inquiry was determinative on the issue of continued vehicle access to the ten-mile portion of the Salt Creek Road. The court stated:

Congress has issued a clear answer to the question of whether the Park Service is authorized to permit activities within national parks that permanently impair unique park resources. The answer is no. As set out in the statutes discussed above, the Park Service's mandate is to permit forms of enjoyment and access that are *consistent* with preservation and *inconsistent* with significant, permanent impairment.

Southern Utah Wilderness Alliance, 7 F. Supp.2d at 1211. Finding that the evidence in the administrative record showed that "the riparian areas in Salt Creek Canyon are unique and that the effects of vehicular traffic beyond Peekaboo Spring are inherently and fundamentally inimical to their continued existence," the district court held that the BMP was inconsistent with the "clear legislative directive" of Congress. Id.

On appeal, Utah Shared Access argues that the district court erred in resolving the issue under the first Chevron inquiry. Utah Shared Access argues

that the district court should have reached the second <u>Chevron</u> inquiry because of ambiguities inherent in the relevant statutes and their application to the issue of vehicular access.[6]  We agree.

We first note that the district court erred in its framing of the question at issue for purposes of <u>Chevron</u> analysis.  The district court characterized the question as whether the NPS is authorized to permit activities within national parks that permanently impair unique park resources.  <u>See</u> <u>Southern Utah Wilderness Alliance</u>, 7 F. Supp.2d at 1211.  Stating the question that way predetermines the answer.  We believe the precise question at issue is whether the BMP, in particular the portion of the BMP allowing vehicle use on the ten-mile segment of the Salt Creek Road from Peekaboo Spring to Angel Arch, is inconsistent with a clear intent of Congress expressed in the Organic Act and the

---

[6]Utah Shared Access also advances an argument that the Salt Creek Road was "grandfathered" in as a road and cannot be closed because it existed prior to the establishment of the park, and the park was established "subject to valid existing rights."  16 U.S.C. § 271.  In support of its argument, Utah Shared Access cites language in the legislative history stating that road access to parts of Glen Canyon National Recreation Area is over jeep trails.  <u>See</u> H.R. Rep. No. 92-1446, <u>reprinted in</u> 1972 U.S.C.C.A.N. 4915, 4916.  We find this argument without merit.  Utah Shared Access has not established that it had any legally cognizable right to use of this jeep trail at the time of the establishment of this park, or even that this particular portion of the jeep trail existed at that time.  In any event, nothing in the statutory language indicates that a jeep trail cannot be closed if closure is deemed necessary for preservation.  The legislative history is inconclusive at best on the issue, and thus carries little weight.  <u>See</u> <u>Miller v. Commissioner of Internal Revenue</u>, 836 F.2d 1274, 1282 (10th Cir. 1988).

Canyonlands enabling legislation. Framing the question in terms of "permanent impairment" might not necessarily be erroneous if the administrative record clearly showed that such permanent impairment would occur; however, we find that the record is not clear on that issue. See discussion infra.

The Organic Act mandates that the NPS provide for the conservation and enjoyment of the scenery and natural historic objects and the wildlife therein "*in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.*" 16 U.S.C. § 1 (emphasis added). Neither the word "unimpaired" nor the phrase "unimpaired for the enjoyment of future generations" is defined in the Act. It is unclear from the statute itself what constitutes impairment, and how both the duration and severity of the impairment are to be evaluated or weighed against the other value of public use of the park.

Although the Act and the Canyonlands enabling legislation place an overarching concern on preservation of resources, we read the Act as permitting the NPS to balance the sometimes conflicting policies of resource conservation and visitor enjoyment in determining what activities should be permitted or prohibited. See 16 U.S.C. § 1 ("to conserve . . . and to provide for the enjoyment of . . . ."); 16 U.S.C. § 271 ("to preserve . . . for the inspiration, benefit, and use of the public . . . ."); see also Bicycle Trails Council v. Babbitt, 82 F.3d 1445, 1468 (9th Cir. 1996) (finding that the NPS "struck a reasoned balance among the

- 14 -

sometimes competing goals of recreation, safety, and resource protection as well as among the sometimes competing recreational interests of bicyclists and other park visitors" and that the authority of the NPS to strike such balances "inheres in the Organic Act and the [Golden Gate National Recreation Area] Act")[7]; Sierra Club v. Babbitt, 69 F. Supp.2d 1202, 1246-47 (E.D. Cal. 1999) ("The Organic Act commits the NPS to the protection and furtherance of two fundamentally competing values; the preservation of natural and cultural resources and the facilitation of public use and enjoyment."). The test for whether the NPS has performed its balancing properly is whether the resulting action leaves the resources "unimpaired for the enjoyment of future generations." Because of the ambiguity inherent in that phrase, we cannot resolve the issue before us under step one of Chevron; instead we must reach step two.

---

[7]Wilderness Alliance argues that Bicycle Trails supports a resolution of the issue in this case under step one of Chevron. Although the Ninth Circuit did proceed under Chevron step one in Bicycle Trails, the precise question at issue in that case was whether the relevant statutory language and legislative history mandated that the NPS discontinue the practice of managing recreation areas under less protective rules than it was using in managing natural and historic areas. See Bicycle Trails, 82 F.3d at 1453. On that precise question, Congress had spoken and had mandated that the NPS eliminate distinctions between recreation units and natural and historic areas. See id. That question is not the one presented in this case. With respect to the NPS's ability to balance competing mandates of use and preservation, Bicycle Trails does not lend support for an analysis under step one of Chevron.

The question for the court under step two of <u>Chevron</u> is "whether the agency's answer is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843. To resolve this question, we must first determine what the agency's position is. In its brief to this court and at oral argument, the NPS has advised us that the Department of the Interior "has conducted a substantive reassessment of the proper construction of the Organic Act." On the basis of that reassessment, the Department took the position in its brief to this court that the Act prohibits "permanent impairment of those resources whose conservation is essential to the fundamental purposes and values for which an individual park has been established." The Department also took the position that the NPS has discretion under the Act to determine what resources are essential to the values and purposes of a particular national park, and what constitutes the impairment of those resources. In supplemental authority provided to this court just prior to oral argument, the Department submitted Draft NPS Management Policies (the "Draft Policies"), which clarify its position further. The Draft Policies address impairment of resources in terms of the duration, extent, timing, and cumulative effect of various impacts on park resources and values. <u>See</u> Letter from Department of the Interior to U.S. Dep't of Justice, 1/13/00, at 2, Supplemental Authority of Federal Appellees. They also are based on a premise that the Organic Act forbids broader categories of impairment in addition to those

- 16 -

considered as permanent. See id. In addition, the Draft Policies provide definitions for various terms in the Organic Act. See Draft NPS Management Policies, 1.4.2.

The Draft Policies propose to define "impairment of park resources and values" as "an adverse impact on one or more park resources or values that interferes with the integrity of the park's resources or values, or with the opportunities that otherwise would exist for the enjoyment of them by a present or future generation." Id. The Draft Policies also propose to define "park resources and values" as "all the resources and values of a park whose conservation is essential to the purposes for which the area was included in the national park system . . .and any additional purposes stated in a park's establishing legislation or proclamation." Id.

The interpretation of the Act now offered by the Department and the NPS in this court and in the Draft Policies varies from the interpretation previously offered by the NPS in the district court.[8] We must determine what weight to give the new interpretation. We conclude that there is currently no valid agency position worthy of deference.

---

[8]The position adopted in the Draft Policies apparently supplants the former position of the NPS and the Department of the Interior. Thus, the former position is one to which the agency no longer subscribes.

An agency is free to change the meaning it attaches to ambiguous statutory language, and the new interpretation may still be accorded Chevron deference. As the Supreme Court stated in Chevron:

> The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.

Chevron, 467 U.S. at 863-64. A position taken by an agency during litigation, however, is not sufficiently formal that it is deserving of Chevron deference. See 1 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 3.5, at 119-20 (3d ed. 1994) (stating that Chevron should not be held to apply to agency pronouncements in less formal formats, such as litigating positions); see also Robert A. Anthony, Which Agency Interpretations Should Bind Citizens and the Courts?, 7 Yale J. on Reg. 1, 60-61 (1990) (stating that an agency's litigating position is not entitled to Chevron deference because "[i]t would exceed the bounds of fair play to allow an institutionally self-interested advocacy position, which may properly carry a bias, to control the judicial outcome") (quotations and citations omitted)). The agency's litigation position in this court thus lacks the requisite formality for Chevron deference under step two.

Similarly, agency policy statements, like litigation positions, do not usually warrant deference under step two of Chevron. See Christensen v. Harris County, __ U.S. __, 120 S. Ct. 1655, 1662-63, 146 L. Ed.2d 421 (2000) (stating that agency interpretations contained in policy statements, agency manuals, and enforcement guidelines do not warrant Chevron-style deference); 1 Davis & Pierce, supra, § 3.5, at 120 (stating that courts should not give binding effect under step two of Chevron to agency interpretative rules or statements of policy). Policy statements do not normally receive Chevron deference because they are usually expressed in an informal format and are not subject to rulemaking procedures. See 5 U.S.C. § 553(b) (exempting interpretative rules and general statements of policy from rulemaking procedures); Anthony, supra, at 43 (stating that "courts have recognized that an interpretation lacks power to command Chevron acceptance if it has been expressed only in an informal format–such as in interpretative rules and policy statements").

A notice of availability of the Draft Policies, however, was published in the Federal Register and the public was given an opportunity to comment on them. See Notice of Availability of Draft National Park Service Management Policies, 65 Fed. Reg. 2984 (2000). Thus, the Draft Policies are unlike typical informal agency policy manuals. The fact that a notice regarding the Draft Policies appeared in the Federal Register and that they were subjected to comment

- 19 -

procedures does not, however, automatically make them deserving of

Chevron deference. The comments must still be considered and a rule must be

properly adopted with a statement of its basis and purpose to complete the notice

and comment rulemaking procedures. See 5 U.S.C. § 553(c). If the Draft

Policies are finalized and adopted pursuant to the requisite rulemaking

procedures, and then construed as substantive or legislative rules, they should be

accorded Chevron deference; however, if, when ultimately finalized, they lack the

requisite formality and are construed merely as interpretative rules, they should be

examined under a less deferential standard that asks whether the agency's

interpretation is "well reasoned" and "has the power to persuade." See Chrysler

Corp. v. Brown, 441 U.S. 281, 301-302, 99 S. Ct. 1705, 1717-18 (1979)

(distinguishing between substantive rules and interpretative rules); Martinez v.

Flowers, 164 F.3d 1257, 1261 (10th Cir. 1998) (articulating the standard for

assessing informal agency decisions); 1 Davis & Pierce, supra, § 6.3, at 235-238

(discussing the distinction between binding legislative rules and potentially

persuasive but nonbinding interpretative rules); Anthony, supra, at 44-46, 55-56

(distinguishing between legislative rules and interpretative rules).

    At this time, the agency's Policies are still only in draft form and have not

yet been finalized or adopted by the agency; therefore, we cannot accord either

Chevron deference or the lesser deference applicable to interpretative rules to the

agency's interpretation of the Act. Having no current interpretation in front of us that has been formally adopted by the agency, we examine the Act and the district court's disposition without giving deference to any agency interpretation. Cf. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988) (stating that no Chevron deference is required when "agency itself has articulated no position on the question").

The district court's legal interpretation of the Act was that the NPS is prohibited from permitting activities that result in "significant, permanent impairment." Southern Utah Wilderness Alliance, 7 F. Supp.2d at 1211. We agree that permitting "significant, permanent impairment" would violate the Act's mandate that the NPS provide for the enjoyment of the parks "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Although "significant, permanent impairment" may not be coterminous with what is prohibited by the Act because other negative impacts may also be prohibited, we find that it is within the range of prohibitions contemplated by Congress.

The district court determined that the administrative record demonstrated that permanent impairment would occur; however, the parties continue to dispute whether the impairment caused by vehicles would be permanent and how serious it would be. The administrative record includes the NPS's FONSI, which stated

that any impairment would be temporary and minor.  In its discussion of the

evidence in the administrative record on impairment, the district court did not

mention that finding by the NPS, which should be reviewed under the standard set

forth in § 706(2) of the APA.  See 5 U.S.C. § 706(2).  Given the conflicting views

regarding the level of impairment that vehicles would cause to the ten-mile

segment of the Salt Creek Road, we remand for the district court to re-examine

the evidence in the record regarding impairment, applying the appropriate

standard to the NPS finding of temporary impairment.

On remand, the district court should not limit its analysis under step two of

Chevron to whether the evidence demonstrates significant, permanent impairment.

Rather, it should assess whether the evidence demonstrates the level of

impairment prohibited by the Act.[9]  Moreover, by the time of trial, the Department

of the Interior may have finalized and adopted its new NPS Management Policies.

If the district court determines that those policies have been expressed in a

binding format through the agency's congressionally delegated power, they should

be considered legislative rules worthy of Chevron deference.  If, however, the

district court determines that they are merely interpretative rules, they should be

---

[9]As the NPS now acknowledges, the range of impairment prohibited by the Act may be broader than "significant, permanent impairment."  See Letter from Department of the Interior to U.S. Dep't of Justice, 1/13/00, at 2, Supplemental Authority of Federal Appellees.

evaluated pursuant to the less deferential standard articulated in <u>Martinez</u>, 164 F. 3d at 1261, and <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944).

C.    The Injunction

Because we find error in the district court's conclusion that the activity at issue is explicitly prohibited by the relevant statutes, we find the district court abused its discretion in granting an injunction. We therefore vacate the district court's order enjoining the BMP's allowance of continued motorized vehicle use on the Salt Creek Road in Salt Creek Canyon above Peekaboo Spring.

D.    Conclusion

The district court erred in finding that step one of <u>Chevron</u> was determinative with respect to the issue of vehicle access on the ten-mile segment of the Salt Creek Road. The analysis must proceed under step two of <u>Chevron</u>, and, in conducting that analysis, the district court must re-examine the evidence in the record regarding impairment caused by vehicles in that area, applying the appropriate standard to the NPS finding of temporary impairment. The district court must also determine the weight to be given to the position of the NPS as to the standards set forth in the Organic Act. We therefore REVERSE the district court's finding that the portion of the BMP allowing continued motor vehicle access on the ten-mile segment of the Salt Creek Road from Peekaboo Spring to

Angel Arch violates the Organic Act and the Canyonlands enabling legislation.

We REMAND for proceedings consistent with this opinion.