F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**June 22, 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FIRST AMERICAN KICKAPOO
OPERATIONS, L.L.C., a Nevada
Limited Liability Company,

      Plaintiff-Appellant,

      v.

MULTIMEDIA GAMES, INC.,

      Defendant-Appellee.

No. 03-6283

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 01-CIV-1395-F)**

---

Harvey D. Ellis, Jr. (Jimmy K. Goodman and David V. Stewart with him on the
brief), Crowe & Dunlevy, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

John F. Heil, III (T. Lane Wilson with him on the brief), Hall, Estill, Hardwick,
Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **O'BRIEN**, **PORFILIO**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Plaintiff First American Kickapoo Operations appeals the district court's grant of summary judgment on its claim for tortious interference with contract. We **AFFIRM.**

*I. Factual Background*

The Indian Gaming Regulatory Act ("IGRA") establishes a statutory basis for the operation and regulation of gaming by Indian tribes to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," while simultaneously "shield[ing tribes] from organized crime and other corrupting influences [and] ensur[ing] that . . . Indian tribe[s are] the primary beneficiar[ies] of . . . gaming operations." 25 U.S.C. § 2702. The IGRA effects these goals in part by providing for federal oversight of contracts between tribes and non-tribal entities for the management of tribal gaming operations. Tribes may enter into contracts for the management of these gaming operations only with the approval of the National Indian Gaming Commission ("NIGC") Chairman. 25 U.S.C. § 2711(a)(1).[1] Unapproved management contracts are void, 25 C.F.R. § 533.7, and a gaming operation that violates any provision of the IGRA is subject to closure and fines of up to $25,000 per violation. 25 U.S.C. § 2713.

On April 30, 2001, the Kickapoo Tribe of Oklahoma entered into an

---

[1]A management contract is a contract that "provides for the management of all or part of a [tribal] gaming operation." 25 C.F.R. § 502.15.

Operating Lease Agreement with First American. The Operating Lease provided for constructing, equipping, and operating a Class II casino on tribal land.[2] First American agreed to construct the casino and lease all the gaming equipment it required. The Tribe agreed to repay, without interest, the costs of construction, although First American guaranteed a monthly payment to the Tribe of $20,000 which took precedence over repaying the construction loan. In return for lease of the gaming equipment, First American was to be paid forty percent of the operation's net revenues. First American indicates that it spent $859,545.90 "establishing and developing" the casino, which opened May 23, 2001. On June 13, 2001, the NIGC notified the Tribe that its gaming ordinances did not comply with the requirements of the IGRA. The Tribe voluntarily closed the casino, and on June 30, 2001 passed gaming ordinances that subsequently met with NIGC approval. Also in June 2001, the Tribe submitted the Operating Lease to the NIGC for an opinion as to whether the Operating Lease was a management contract requiring NIGC approval. In a letter dated June 29, 2001, Deputy General Counsel for the NIGC offered her opinion that the Operating Lease was a management contract. On July 27, 2001, the Tribe's business committee

_____

[2]The IGRA divides Indian gaming into three classes. Class I consists of traditional forms of gaming associated with ceremonies and celebrations, Class II consists primarily of bingo and related games, and Class III encompasses all other forms of gaming, including slot machines. 25 U.S.C. § 2703.

3

unanimously decided to terminate the Tribe's relationship with First American. On August 17, 2001, the Tribe executed a letter of intent with Multimedia Games, and subsequently entered into a non-exclusive agreement to rent gaming equipment from Multimedia.

## II. Procedural History and Standard of Review

The Operating Lease provides that any claim arising out of or related to it must be adjudicated in the Tribe's courts; First American has brought suit against the Tribe in tribal court. Art. 11(A). In addition, First American filed suit against Multimedia in Oklahoma state court, requesting injunctive relief and damages for tortious interference with contractual and business relations. Multimedia removed the case to federal court, where First American's motion for a preliminary injunction was denied.

In March 2002, Multimedia moved for summary judgment on First American's claim of tortious interference with contract, arguing that the Operating Lease fell within the regulations' definition of a management contract and was therefore void for lack of NIGC approval. Multimedia maintained that a void contract cannot serve as a predicate for a claim for tortious interference with contract and that summary judgment was therefore appropriate on this claim. The district court denied the motion in May 2002, holding that "the language of the Operating Lease is ambiguous with respect to whether that agreement provides for

4

management of [the gaming operation] by First American." Order of May 8, 2002 at 3.

On the same day in June 2003, both parties moved for summary judgment. First American urged the court to find that any provisions in the Operating Lease providing for management were severable, and that the remainder constituted a valid construction loan and equipment lease. Multimedia moved for summary judgment on both the tortious interference with contract and tortious interference with business relations claims, but on grounds unrelated to the validity of the Operating Lease. The district court denied both motions on July 17, 2003, holding with regard to First American's motion that the operation of a severability clause in the Operating Lease depended on the parties' intentions and other disputed fact questions. Neither party moved for summary judgment again.

While the district court never explicitly revised its holding that the Operating Lease was ambiguous, between July and September 2003 the district court and the parties appear to have experienced a change of mind on the issue. In an order following a pretrial conference, the district court stated that "[t]he parties are in agreement that the determination as to whether the agreement is a management contract is a question of law for the court." Order of Sept. 2, 2003 at 3. The district court invited the parties to submit whatever extrinsic evidence they thought relevant to the question. The court determined the Operating Lease

to be an unapproved management contract and therefore void, "leav[ing] the plaintiff with a claim based on the existence of a 'business relationship.'" Order of Sept. 6, 2003 at 3. First American accordingly tried its remaining claim for tortious interference with business relations to a jury, which found for Multimedia.

First American appeals the district court's order rejecting its claim for tortious interference with contractual relations. First, it argues that the Operating Lease is ambiguous and on that account should have been interpreted by a jury. Second, even if the language of the Operating Lease is unambiguous and therefore suitable for interpretation as a matter of law, First American maintains that the district court should have found the Operating Lease not to be a management contract. Third, even if the lease is an unapproved management contract, First American insists that it can nevertheless form the basis for a suit for tortious interference with contract. Finally, First American urges that we sever those portions of the contract which might make it a management contract, leaving the remainder of the contract to furnish a basis for its claim for tortious interference with contract.

The district court did not specify the legal nature of its September 6, 2003 order rejecting First American's claim for tortious interference with contract. We conclude, however, that the court granted summary judgment. The order

6

essentially adopts the reasoning put forward by Multimedia's briefs in support of its first motion for summary judgment, suggesting that the district court regarded its order of September 6 as a grant of summary judgment. Moreover, the order does not resolve any disputed questions of fact.

To be sure, we cannot tell whether the September 6 order was in the nature of a reconsideration of the district court's order of May 8, 2002 denying Multimedia's first motion for summary judgment, or whether it was a sua sponte grant of summary judgment. Ultimately, this does not matter, because either approach would be permissible. A court's disposition of a single claim in a suit involving multiple claims is subject to reconsideration until the entry of judgment on all of the claims, absent an explicit direction for the entry of judgment on the single claim. Fed. R. Civ. P. 54(b); *see also Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Paramount Pictures Corp. v. Thompson Theaters, Inc.*, 621 F.2d 1088, 1090 (10th Cir. 1980) ("[T]he court retains the power to alter rulings until final judgment is entered on a cause.").

The district court could also have granted summary judgment sua sponte. While we do not encourage the practice of granting summary judgment sua sponte, we will not reverse absent evidence of prejudice. So long as "the losing

7

party was on notice that [it] had to come forward with all of [its] evidence," a sua sponte grant of summary judgment may be appropriate. *Ward v. Utah*, 398 F.3d 1239, 1245–46 (10th Cir. 2005) (quoting *Celotex Corp v. Catrett*, 477 U.S. 317, 326 (1986)). Since Multimedia's first motion for summary judgment was argued on precisely the grounds ultimately adopted by the district court, First American was on notice to provide all of its evidence relevant to this argument. Moreover, before ruling on whether the Operating Lease was a management contract—the same ruling that disposed of the tortious interference with contract claim—the district court invited the parties to proffer any extrinsic evidence they thought relevant to this question. Order of Sept. 2, 2003 at 2.

While it would have facilitated appellate review for the district court to be more explicit about what it was doing, the district court did not commit reversible error in proceeding as it did. Whatever the precise path the district court took to granting summary judgment, we review that grant de novo, applying the same legal standard employed by the district court. *Simms v. Okla. ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*III. Analysis*

*A. Ambiguity and Extrinsic Evidence*

8

First American first complains that the district court erred in construing an ambiguous contract as a matter of law. The district court's reception of extrinsic evidence, in First American's estimation, confirms the court's unchanged assessment of the Operating Lease as ambiguous, violates the Oklahoma law of contracts, and requires reversal. Although the district court's admission of extrinsic evidence may have been error, we do not agree that the district court used the evidence to construe an ambiguous contract, or that any error in admitting the evidence warrants reversal.

First American emphasizes that the district court "never recanted" its early determination that the Operating Lease is ambiguous. Aplt. Br. at 19. But the court's September 2003 orders amply demonstrate that the district court did in fact revise its earlier finding. First, the parties and the court were in apparent agreement that the construction of the contract was a matter of law, an agreement inconsistent with a continuing belief that the Operating Lease is ambiguous. Second, while extrinsic evidence is often received to resolve contractual ambiguities, the district court's September 2003 orders explain that the evidence was intended to provide context for the agreement, not to clarify any ambiguities. In admitting extrinsic evidence the court was "not so much concerned about whether or not any particular language in the agreement is ambiguous as it [was] about the overall context in which the agreement was entered into and the

9

business purposes which animated the parties to the contract in entering into the contract." Order of Sept. 2, 2003 at 2. In its September 6 order, the district court put the extrinsic evidence submitted to the use anticipated in the earlier order; the court's conclusion that the Operating Lease is a management contract is "based on the language of the agreement," and the extrinsic evidence shows that this conclusion "is entirely consonant with the context in which the agreement was negotiated and executed and the business purposes of the parties to the agreement." Order of Sept. 6, 2003 at 2. The admission of extrinsic evidence thus did not signal an ongoing assessment of the contract as ambiguous.

But even if the district court did revise its earlier finding of ambiguity, First American argues that the district court nevertheless erred in admitting extrinsic evidence to construe an unambiguous contract. The district court's September 2 order distinguishes between the use of extrinsic evidence to clarify an ambiguous contract and the use of extrinsic evidence to illuminate the context in which an unambiguous contract was executed. There is considerable support for the district court's position, some of it from the Oklahoma courts and this Court. *See Amoco Production Co. v. Lindley*, 609 P.2d 733, 741–42 (Okla. 1980) ("The contract can be explained through the circumstances at the time of contracting and subsequently taking into consideration the subject matter thereof."); *Gibbs v. Trinity Universal Ins. Co.*, 330 P.2d 1035, 1037 (Okla. 1958)

10

("In order to ascertain the intent [of the parties to a contract], it is sometimes necessary, and always proper, to consider the situation of the parties and the legal principles which they are presumed to know and have in mind."); *see also First Nat. Bank in Dallas v. Rozelle*, 493 F.2d 1196, 1200–01 (10th Cir. 1974) ("[T]he surrounding circumstances and the relationship of the parties should be taken into consideration. . . . [C]onstruing the contract in the light of the surrounding circumstances known to the parties at the time of its execution does not violate the parol evidence rule, even though the writing is not deemed ambiguous.") (internal citations omitted) (applying Oklahoma law); 11 Williston on Contracts § 32:7 (4th ed. 1999); 5 Corbin on Contracts § 24.7 (rev. ed. 1998); Restatement (Second) Contracts § 212(1) & cmt. b (1981).

First American insists, however, that the current state of Oklahoma contract law precludes the use of extrinsic evidence to interpret unambiguous contracts. *See Pitco Production Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003) ("To decide whether a contract is ambiguous we look to the language of the entire agreement. . . . If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument.") (footnotes omitted); *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 767 (10th

11

Cir. 1999) ("If the contract is ambiguous . . . we may resort to extrinsic evidence . . . to construe the agreement. However, if the contract is unambiguous its language is the only legitimate evidence of what the parties intended . . . .") (internal citation omitted).

When sitting in diversity jurisdiction, this court applies the most recent version of the law articulated by the state's highest court. *Vitkus v. Beatrice Co.*, 127 F.3d 936, 941–42 (10th Cir. 1997). The current state of the Oklahoma law of contracts appears to be that unambiguous contracts may be construed only in light of the language contained within the contracts' four corners. We need not resolve this question of state law, however, because an error in the admission of evidence is harmful only if the substantial rights of a party are affected. Fed. R. Civ. P. 61. Because we agree with the district court's ultimate determination that the contract is unambiguously a management contract, the district court's error in admitting extrinsic evidence was harmless. *Cf. U.S. v. 1,253.14 Acres,* 455 F.2d 1177, 1180 (10th Cir. 1972) (holding that the admission of a letter written six months after the contract was executed was "not prejudicial since the court's judgment is sustained by evidence independent of the letter").

B. *Management Contracts*

First American next argues that the district court erred in holding that the Operating Lease is a management contract, and thus subject to NIGC approval.

12

The district court found the Operating Lease to be "much more than a vendor's agreement to provide gaming equipment." Order of Sept. 6, 2003 at 2. In so holding, the district court referred to the NIGC Deputy General Counsel's opinion letter and Multimedia's March 20, 2002 brief, both of which singled out for censure numerous provisions in the Operating Lease. According to the district court, "[t]he provision of the totality of the expertise and services which the [Operating Lease] obligates First American to provide would clearly amount to management of at least 'part of' (indeed, major portions) of the gaming operation." *Id*.

The regulations promulgated under the IGRA define a management contract as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor . . . if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. While neither the statute nor the regulations define management, the regulations do define a primary management official as any person "who has authority . . . [t]o set up working policy for the gaming operation." 25 C.F.R. § 502.19.

The Operating Lease affords First American considerable opportunity "to set up working policy" for the Tribe's gaming operation. The Operating Lease obliges First American to develop employment procedures:

[First American] shall have the responsibility in the form of Technical Assistance to formulate procedures approved by the

13

> Business Committee, which provide for employment, direction, control, and discharging of all personnel performing services in and on the properties in connection with the maintenance, operation, and management of the [gaming operation] . . . Said approval shall [be] accomplished within ten (10) working days and in the absence of action shall be deemed approved.

Operating Lease, Article 4(H)(3); 25 C.F.R. §531.1(b)(12). The Operating Lease assigns the responsibility for formulating procedures for managing employees to First American, not to the Tribe, and there is no provision in the Operating Lease for the Tribe to formulate those procedures itself should it disapprove of First American's procedures. Moreover, the language of the article assumes that the Tribe's business committee will approve First American's proposed rules, and it provides for approval by default if the Tribe does not act quickly to register any dissatisfaction with them.

Other provisions require First American to provide additional management services. First American is obliged to provide "supervisors who supervise the Skill Game Center Facilities in the compliance with the terms of this agreement." Art. 4(A). The Tribe is given thirty days to review and approve a plan of operation of the facilities, a plan presumably prepared by First American. *Id*. First American will provide personnel who will "supervise, train, and instruct" the Tribe's employees for the first three months after the opening of the operation. Art. 4(H)(2); 25 C.F.R. §531.1(b)(4).

It is not only the definition of management extrapolated from the

14

regulations' definition of primary management official that suggests the Operating Lease is a management contract. The statute and regulations also list responsibilities and benefits a contract must allocate between tribe and management contractor if it is to be approved by the NIGC. These requirements include limits on the term of a management contract and the percentage of a gaming operation's income the management contractor may receive as a fee, provision for a guaranteed minimum monthly payment to the tribe, and the assignment of a variety of functions to one party or the other. There is no requirement that each of the enumerated functions be performed by the management contractor, only that the "responsibilities of each of the parties for each identifiable function" be enumerated. 25 C.F.R. § 531.1(b).

The Operating Lease contains a number of features the statute and regulations require of management contracts. The Operating Lease provides that First American will receive "as an Equipment Lease Fee" forty percent of monthly net game revenues from the gaming operation. Art. 5(B)(1)(a). Forty percent of net revenues is the maximum percentage permitted by the statute,[3] a coincidence that suggests the Operating Lease was drafted with a view to

---

[3]The statute sets the ceiling for the percentage fee at thirty percent in ordinary cases. 25 U.S.C. § 2711(c)(1); 25 C.F.R. §531.1(i)(1). It is only when the NIGC Chairman determines that the capital expenditure and income projections associated with a project justify a higher fee that forty percent may be charged.

compliance with this restriction. *See* 25 U.S.C. § 2711 (c)(2); 25 C.F.R. §531.1(i)(2). That suggestion is reinforced by the fact that the length of the Operating Lease is five years, the maximum term permitted by the statute. Art. 3(B); 25 U.S.C. § 2711(b)(5); 25 C.F.R. §531.1(h).[4] The Operating Lease also satisfies the statute's requirement that the Tribe be guaranteed a "minimum . . . payment . . . that has preference over the retirement of development and construction costs." 25 U.S.C. § 2711(b)(3); 25 C.F.R. §531.1(f). The Operating Lease guarantees the Tribe a monthly payment of $20,000 from First American, which "takes precedence over the reimbursements of development and construction costs advanced by [First American]." Art. 5(B)(1)(c). The Operating Lease also sets a ceiling for the amount First American will spend on development and improvements, and a corresponding limit on the amount it can recover from the Tribe, as required by the statute. Art. 4(B); 25 U.S.C. § 2711(b)(4); 25 C.F.R. §531.1(g).

The district court's determination that the Operating Lease is unambiguously a management contract is supported by an NIGC Bulletin discussing in general terms the distinction between management contracts and

---

[4]The Operating Lease provides that the Tribe and First American may renegotiate the contract for two additional years, bringing the term of the contract to seven years, the maximum length permitted by the statute even with a showing that capital expenditure and income projections justify an increased term. Art. 3(B); 25 U.S.C. § 2711(b)(5); 25 C.F.R. 531.1(h).

16

consulting agreements and by an informal opinion letter authored by the NIGC Deputy General Counsel identifying the Operating Lease as a management contract. The informal pronouncements of an agency, which are not subject to agency rule-making procedures, do not warrant *Chevron* deference. *See S. Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000). Rather than requiring our deference, such materials may be accepted by a court only as they have power to persuade. *Skidmore v. Swift*, 323 U.S. 134, 140 (1944). While we do not defer to the opinions expressed in the Opinion Letter and Bulletin 94-5, we do observe that the NIGC's apparent position coincides with our holding in this case.

Bulletin 94-5 defines management broadly to include "planning, organizing, directing, coordinating, and controlling . . . all or part of a gaming operation." NIGC Bulletin 94-5 at 2. The Bulletin singles out seven management activities as especially probative of the question whether an agreement is a management contract. *Id*. at 2–3. An agreement need not include all seven activities to be a management contract; the "presence of all or part of these activities in a contract with a tribe strongly suggests that the contract or agreement is a management contract requiring [NIGC] approval." *Id*. at 2. The Operating Lease contains five of the seven provisions the Bulletin identifies as highly suggestive of a management agreement: provision for accounting procedures, payment of a

17

minimum guaranteed amount to the tribe, construction financed by a non-tribal party, a contract that establishes an ongoing relationship between a tribe and non-tribal party, and compensation based on a percentage fee.

This conclusion is reinforced by the fact that the Operating Lease does not much resemble a consulting agreement, which Bulletin 94-5 opposes to management contracts. A contract that identifies a finite task, specifies a date for its completion, and provides recompense based on an hourly or daily rate or fixed fee "may very well be determined to be a consulting agreement" rather than a management contract. Bulletin 94-5 at 3.

The opinion letter authored by the NIGC Deputy General Counsel also identifies the Operating Lease as a management contract. The opinion letter singles out provisions in the Operating Lease permitting First American to develop procedures, supervise completion of construction and improvements, and train and supervise employees for the first three months of operation. The opinion letter also notes that a five year term is "typical" of management contracts, and that reimbursement based on a percentage fee gives First American a strong incentive to manage, so as to maximize its own return. Opinion Letter at 2–3. While the Bulletin and the opinion letter do not compel our deference, they do offer confirmation of our conclusion that the Operating Lease is indeed a management contract.

Despite the close correspondence between the Operating Lease and the requirements of the regulations, First American insists that the Operating Lease is not a management contract because neither party intended it to be a management contract, because it was not performed as a management contract, and because it confers no rights to manage, only opportunities to do so at the Tribe's request. It is questionable whether Oklahoma law permits the use of extrinsic evidence in construing unambiguous contracts, and even if it did, the evidence as to the parties' intentions and the manner in which the contract was performed does little to advance its position.

First American's last argument, however, that a contract is only a management contract if it confers rights rather than opportunities to manage, would be significant if it accurately stated the law. But this argument is problematic for several reasons, not least of which is the fact that neither the statute nor the regulations contain a definition of manager or management that would suggest that management is only management when the manager's decisions are not subject to tribal oversight. Nor does the ordinary definition of management suggest that a manager is not a manager if an owner, board, or other manager is capable of overriding particular management decisions. Bulletin 94-5 agrees that "[t]he exercise of [ultimate] decision-making authority by the tribal council or the board of directors does not mean that an entity or individual

19

reporting to such a body is not 'managing' all or part of the operation." Bulletin at 3.

First American cites a number of cases to support its argument, but none of them is particularly supportive. Some of the cases cited contain no analysis of what makes an agreement a management contract because the agreement involved was acknowledged by the parties and the court to be a management contract. *See World Touch Gaming, Inc. v. Massena Mgmt.*, 117 F. Supp. 2d 271 (N.D.N.Y 2000); *First Am. Casino Corp. v. E. Pequot Nation*, 175 F. Supp. 2d 205 (D. Conn. 2000); *United States ex rel. Mosay v. Buffalo Bros. Mgmt., Inc.*, 1993 WL 643378 (W.D. Wisc. Aug. 17, 1993). Others contain no relevant analysis because they identified the agreement as a consulting agreement. *See Bounceback Technologies.Com, Inc. v. Harrah's Entm't, Inc.*, 2003 WL 21432579 (D. Minn. June 13, 2003); *Calumet Gaming Group-Kansas, Inc. v. Kickapoo Tribe of Kansas*, 987 F. Supp. 1321 (D. Kan. 1998). One of First American's cases identifies as a de facto management contract three contracts that, read together, effectively revoked a tribe's managerial authority and vested it in a purported consultant. *See United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 425–26 (8th Cir. 2001). But *Casino Magic* does not generalize its holding beyond its facts, and it stops well short of holding that management contracts are only those agreements that strip a tribe of decision-making authority entirely.

20

First American does not argue that the functions the Operating Lease oblige it to perform are not management functions. Rather, First American contends that it is only when those functions are performed as a matter of right that a contract granting such rights is a management contract. Neither the statute nor the regulations imply such a limitation. Indeed, the regulations' definition of a management contract as an agreement that provides for the management of "all or part" of a gaming operation suggests a definition of management that is partial rather than absolute, contingent rather than comprehensive. The Operating Lease allowed First American to set up the working policy of the Tribe's gaming operation, and many of its features bear more than a passing resemblance to the minimum requirements of a management contract. The district court correctly determined that the Operating Lease is unambiguously a management contract.

## C. Tortious Interference with Contract

First American next complains that even if the district court correctly determined the Operating Lease to be a management contract, it erred in holding that the Lease could not serve as the basis of a claim for tortious interference with contract. The district court held that "[t]he agreement was not approved by the NIGC, as is required for management contracts. It is, for that reason, void. . . . [T]his determination leaves the plaintiff with a claim based on the existence of a 'business relationship' . . . ." Order of Sept. 6, 2003 at 3. Implicit in this ruling

21

is the conclusion that a void contract may not form the basis of a claim for tortious interference with contract.

The regulations announce in clear terms the consequences of failing to obtain NIGC approval for a management contract: "Management contracts . . . that have not been approved by the Secretary of the Interior or the Chairman in accordance with the requirements of this part, are void." 25 C.F.R. § 533.7. First American concedes that the regulation designates unapproved management contracts as void, but urges us to interpret the term "void" as meaning "unenforceable," claiming this interpretation is necessary "to avoid illogical, unreasonable or inconsistent results." Aplt. Br. at 33–34. After all, First American reasons, all management contracts are unapproved management contracts until they are approved by the Chairman of the NIGC. If those unapproved contracts are truly void because unapproved, then there will never be anything for the NIGC to approve. The "illogical, unreasonable, or inconsistent" result that flows from reading the regulation to mean what it says is that if the Operating Lease "were truly 'void' then it would not be capable of becoming enforceable through the approval of the NIGC." Aplt. Br. at 37. This is not convincing. A contract is an agreement to which the law attaches a duty to perform and penalties for nonperformance. *See* Black's Law Dictionary 318 (7th ed. 1999). Certain formalities, which can vary with the circumstances, must take

place before an agreement becomes a contract. The regulations' requirement that management contracts be approved to be valid creates no ontological mystery whereby a contract springs fully-fashioned from nothingness, but rather identifies a formality necessary before an agreement to manage a tribal gaming operation can become a contract so to manage. Lacking the formality of NIGC approval, an agreement to manage does not become a contract: it is void. *See Casino Magic*, 293 F.3d at 421 ("For a management contract involving Indian land to become a binding legal document, it must be approved by the . . . [NIGC].").

Apart from the argument that a literal reading of the statute leaves nothing for the NIGC to approve, First American has failed even to argue that the plain language of the regulation leads to the "illogical, inconsistent or unreasonable" results of which it complains. Absent some evidence or argument that the language of the regulation undermines the statute under which it was promulgated, we must decline to adopt a construction of the regulation so at odds with its language.

Even if we were to hold that an unapproved management contract is merely unenforceable, rather than void, it would not follow that First American has a claim for tortious interference. Oklahoma law requires an enforceable contract as a predicate to a suit for tortious interference with contract: "The right to recover for the unlawful interference with the performance of a contract presupposes the

23

existence of a valid enforceable contract." *Ellison v. An-Son Corp.*, 751 P.2d 1102, 1106 (Okla. Ct. App. 1987) (quoting *Bailey v. Banister,* 200 F.2d 683, 685 (10th Cir. 1952)). First American attempts to distinguish *Ellison* and *Bailey* by arguing that the Operating Lease "was still subject to NIGC approval and could still have become both valid and enforceable if that approval was conferred." This distinction is not a distinction at all, but rather a description of the situation of the plaintiffs in both *Ellison* and *Bailey*. The plaintiff in *Ellison* had been the high bidder for an oil and gas lease at a public auction but "did not have a lease which had been accepted by the Bureau of Indian Affairs." 751 P.2d at 1106. In *Bailey*, the Assistant Area Director of Indian Affairs had accepted the purchase price of land from the plaintiff, but the sale had not yet been authorized by the Area Director or Secretary of the Interior. 200 F.2d at 684–85. At the point at which the defendants in *Ellison* and *Bailey* intervened, the plaintiffs had agreements with the potential to become contracts, but, lacking requisite approvals, they did not have contracts. And under these circumstances the Oklahoma Court of Civil Appeals and this Court found that the plaintiffs could not maintain actions for tortious interference with contractual relations.

First American invokes Prosser and Keeton in support of the proposition that contracts voidable due to "conditions precedent to the existence of the obligation, can still afford a basis for a tort action when the defendant interferes

24

with their performance." W. Page Keeton et al., *Prosser and Keeton on Torts* §

129 at 995 (5th ed. 1984) (footnote omitted). Agreements which violate public

policy, however, do not fall within this rule. In order to form the basis of a claim

for tortious interference with contract, a contract must not be "opposed to public

policy, so that the law will not aid in upholding it." *Id.* at 994 (footnote omitted);

*see also* Restatement (Second) of Torts § 774 ("One who by appropriate means

causes the nonperformance of an illegal agreement or an agreement having a

purpose or effect in violation of an established public policy is not liable for

pecuniary harm resulting from the nonperformance."). Congress has determined

that requiring NIGC approval of management contracts will advance its efforts to

protect tribes from unsuitable influences and to ensure that tribes are the primary

beneficiaries of Indian gaming operations. *See* 25 U.S.C. §§ 2702, 2711.

Oklahoma law, the law of this Circuit, and even the authorities on which First

American relies, all support the position that an unapproved management contract

may not form the basis of a suit for tortious interference with contract. Such

perfect agreement is sufficiently rare that we are loath to disturb it.

*D. Severability*

   Finally, First American argues that the district court erred in failing to give

effect to the severability clause in the Operating Lease, so that the "otherwise valid construction loan and equipment lease" could still form the basis of a suit for tortious interference with contract.[5] Aplt. Br. at 44. The Operating Lease provides that "each and every portion of this Agreement is severable and the invalidity of one or more such provisions shall not in any way effect [sic] the validity of this Agreement or any other provision of this Agreement." Art. 16. First American argues that since the parties' intentions determine if a contract is severable or entire under Oklahoma law, the existence of the severability clause in the Operating Lease should be given "considerable weight." Aplt. Rep. Br. at 22 (quoting 15 Williston on Contracts § 45.5 (4th ed. 2000)). We agree that contracting parties' intentions determine whether a contract is divisible or entire under Oklahoma contract law. *Greater Oklahoma City Amusements, Inc. v.*

---

[5]It may be questioned whether any part of a contract determined to be void ab initio, including the severability provisions, may be enforced. Apart from a single footnote in Multimedia's Brief referring us to one case decided before passage of the IGRA and another recently vacated by the Sixth Circuit Court of Appeals, we have not had the benefit of the parties' argument on this issue. As our discussion in text makes evident, First American's claim fails even if the ordinary severability principles of Oklahoma contract law apply. We therefore decline to address this question. *See Griffin v. Davies,* 929 F.2d 550, 554 (10th Cir. 1991) (citation omitted).

*Moyer*, 477 P.2d 73, 75 (Okla. 1970). A contract is entire if its provisions are interdependent, so that "all of the things, as a whole, are of the essence of the contract [so that] it appeared that the purpose was to take the whole or none." *Id*. (citation omitted).

First American characterizes the Operating Lease as an equipment lease and a construction loan from which any invalid management provisions can easily be excised. We find, however, that the Operating Lease may not be neatly anatomized into valid and invalid portions. Several of the management features we identified above permit First American to exert considerable and continuing influence over the day-to-day running of the Tribe's gaming operation. The Operating Lease permitted First American to develop employment policy, Art. 4(H)(3), to supervise employees for the first three months, Art. 4(H)(2), to create a plan of operation, Art. 4(A), to establish a start-up budget, Art. 4(C), and to formulate an operating budget, Art. 4(D). First American did not bargain merely for the right to repayment of construction costs and equipment lease fees, but for a right to repayment from the proceeds of an operation the Operating Lease had allowed it to structure. First American's management of the casino cannot be

erased simply by dividing the Operating Lease at this date into construction loan, equipment lease, and incidental management provisions, and it is far from certain that First American would have agreed to such a substantial investment without the ability to formulate policies ensuring the operation's profitability.

First American's glib division of the contract into loan and lease also omits discussion of the Tribe's incentives to enter into the Operating Lease. First American, "having held itself out to the Tribe as experienced in the field of development and managing various business enterprises," guaranteed the Tribe a monthly payment of $20,000 that took precedence over the repayment of the construction loan. Art. 5(B)(1)(c). First American "specifically agree[d] that [this guaranteed payment] is a material and substantial term and condition of this Agreement." *Id.* First American's tidily bifurcated version of the Operating Lease makes no mention of this material and substantial term. A management contract must include provision for such a payment, 25 U.S.C. § 2711(b)(3); 25 C.F.R. 531.1(f), and it seems most unlikely that the Tribe would have entered into an agreement permitting First American to assume management functions without also guaranteeing a minimum return to the Tribe. A contract is entire when its

28

various provisions are a "package deal." *Moyer*, 477 P.2d at 75. First American's proposed severed version of the contract does not account for a provision that was almost certainly part of the package for which the Tribe bargained, and is therefore unconvincing.

### III. Conclusion

Non-tribal parties who enter into contracts relating to tribal gaming undertake, in addition to ordinary business risks, certain regulatory risks as well. First American elected to execute a de facto management contract without the fuss and bother of NIGC approval and now wishes Multimedia to assume the costs of First American's decision. We conclude that under Oklahoma law an unapproved management contract, being void, cannot be the basis for a suit against a third party for tortious interference.

The decision of the district court is **AFFIRMED.**